FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff-Appellee*,<br><br>v.<br><br>NOAH KLEINMAN, AKA Chuckles,<br>*Defendant-Appellant.* | No. 14-50585<br><br>D.C. No.<br>2:11-cr-00893-<br>ODW-2<br><br><br>ORDER AND<br>AMENDED<br>OPINION |

Appeal from the United States District Court
for the Central District of California
Otis D. Wright II, District Judge, Presiding

Argued and Submitted April 4, 2017
Pasadena, California

Filed June 16, 2017
Amended January 22, 2018

Before: DAVID M. EBEL,\* MILAN D. SMITH, JR., and
N. RANDY SMITH, Circuit Judges.

---

\* The Honorable David M. Ebel, United States Circuit Judge for the
U.S. Court of Appeals for the Tenth Circuit, sitting by designation.

Order;
Opinion by Judge Milan D. Smith, Jr.

## SUMMARY[**]

### Criminal Law

The panel granted a petition for panel rehearing, withdrew an opinion filed June 16, 2017, filed a superseding opinion affirming a conviction and sentence arising out of the operation of purported medical-marijuana collective storefronts in California, and denied on behalf of the court a petition for rehearing en banc.

The defendant argued that a congressional appropriations rider enjoining use of United States Department of Justice funds in certain medical marijuana cases prohibits continued prosecution of his case, and that he is entitled to an evidentiary hearing under *United States v. McIntosh*, 833 F.3d 1163 (9th Cir. 2016), to determine whether he strictly complied with all relevant conditions imposed by state law.

The panel held that the rider only prohibits the expenditure of DOJ funds in connection with a specific charge involving conduct that is fully compliant with state laws regarding medical marijuana; that the rider does not require a court to vacate convictions that were obtained before the rider took effect; and that the rider, if it applies to this case at all, might operate to bar the DOJ from continuing

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

to defend the prosecution on appeal insofar as it relates to those counts that may be determined to involve only conduct that wholly complies with California medical marijuana law.

The panel concluded that the defendant is not entitled to a *McIntosh* remand in this case because (1) his conviction and sentence were entered before the rider took effect; (2) the rider does not bar the DOJ from spending funds in connection with Counts 1 and 6, which definitively involved conduct that violated state law; (3) even if the rider applied to Counts 2 through 5, an open question, the panel's rulings on Counts 1 and 6 are dispositive of all counts since the defendant's substantive appellate claims concern all counts equally; and (4) the defendant does not win relief on any of his other arguments, so a *McIntosh* remand on Counts 2 through 5 is unnecessary.

The panel held that the district court erred by instructing the jury that "[t]here is no such thing as valid jury nullification," and that it "would violate [its] oath and the law if [it] willfully brought a verdict contrary to the law given to [it] in this case." The panel held that because there is no right to jury nullification, the error was harmless.

The panel held that the district court did not err by denying the defendant's motion to suppress, because the dispensary's practice, as described in the warrant affidavit, of requiring members to designate the dispensary as their primary caregiver and then allowing members to purchase marijuana immediately after, provided probable cause to believe that the dispensary was operating illegally. The panel held that the district court did not err by denying the defendant a *Franks* hearing, or by declining to instruct the jury on the defendant's joint-ownership defense.

The panel held that the district court did not abuse its discretion by considering the government's late-filed objections to the presentence report, and that the sentence is substantively and procedurally reasonable.

## COUNSEL

Becky S. James (argued) and Rachael A. Robinson, Greenberg Gross LLP, Los Angeles, California, for Defendant-Appellant.

Julie Shemitz (argued) and David P. Kowal (argued), Assistant United States Attorneys; Lawrence S. Middleton, Chief, Criminal Division; United States Attorney's Office, Los Angeles, California; for Plaintiff-Appellee.

Paula M. Mitchell, Ninth Circuit Appellate Clinic, Alarcón Advocacy Center, Loyola Law School, Los Angeles, California, for Amici Curiae Members of Congress.

Roger I. Roots, Livingston, Montana, for Amicus Curiae Fully Informed Jury Association.

Alexandra W. Yates, Deputy Federal Public Defender; Hilary Potashner, Federal Public Defender; Office of the Federal Public Defender, Los Angeles, California; for Amici Curiae Federal Public and Community Defenders for Alaska; Arizona; The Central, Eastern, Northern, and Southern Districts of California; Guam; Hawaii; Idaho; Montana; Nevada; Oregon; and the Eastern and Western Districts of Washington.

## ORDER

Defendant-Appellant's petition for panel rehearing is GRANTED.  The opinion filed June 16, 2017, and reported at 859 F.3d 825, is hereby withdrawn.  A superseding opinion will be filed concurrently with this order.

Judge M. Smith and Judge N.R. Smith vote to deny the petition for rehearing en banc, and Judge Ebel so recommends.  The full court has been advised of the petition for rehearing en banc, and no judge requested a vote on whether to rehear the matter en banc.  Fed. R. App. P. 35. The petition for rehearing en banc, filed the same date, is DENIED.   No further petitions for panel rehearing or rehearing en banc will be entertained.

## OPINION

M. SMITH, Circuit Judge:

Noah Kleinman appeals his jury conviction and 211 month sentence for conspiracy to distribute and possess marijuana, distribution of marijuana, maintaining a drug-involved premises, and conspiracy to commit money laundering.  His offenses arose out of purported medical marijuana collective storefronts that he operated with his co-defendants in California, which he alleges complied with state law.   On appeal, Kleinman argues that (1) a congressional appropriations rider enjoining use of United States Department of Justice (DOJ) funds in certain medical marijuana cases prohibits continued prosecution of his case; (2) the district court gave an anti-nullification jury instruction that effectively coerced a guilty verdict; (3) the district court erroneously denied Kleinman's motion to

suppress evidence seized pursuant to a faulty search warrant; (4) the district court erred by not granting an evidentiary hearing on the validity of the affidavit supporting the search warrant; (5) the district court erred by refusing to instruct the jury on Kleinman's defense theory; and (6) the 211 month sentence was substantively and procedurally unreasonable. For the reasons described herein, we AFFIRM Kleinman's conviction and sentence.

## FACTS AND PRIOR PROCEEDINGS

Kleinman, along with defendant Paul Montoya and others, began operating purported medical marijuana collectives in California around 2006. In 2007 or 2008 they opened their fourth store, NoHo Caregivers (NoHo), which the government alleged was the hub of a large conspiracy to distribute marijuana. At trial, witnesses testified that Kleinman and his associates sold 90% of their marijuana outside of their storefronts, used encrypted phones and burner phones to communicate, drove rented cars to escape detection, hid drugs and money in "stash apartments" rented for that purpose, and shipped marijuana hidden in hollowed-out computer towers to customers in New York and Philadelphia.

In 2010, pursuant to a Los Angeles Police Department (LAPD) investigation of medical marijuana collectives, two undercover officers entered Kleinman's dispensary Medco Organics (Medco) and purchased marijuana. The LAPD then obtained a search warrant and seized evidence, and California initiated criminal proceedings against Kleinman. He moved to dismiss the case, arguing that he had complete immunity from prosecution pursuant to California medical marijuana laws. The state did not file an objection. During a preliminary hearing on the dismissal motion, the deputy district attorney stated that he did not see a basis on which to

deny Kleinman's motion, and the state court dismissed the charges. After the case was dismissed, the United States Drug Enforcement Administration (DEA) seized the evidence in the LAPD's custody.

In 2011, a federal grand jury indicted Kleinman, Montoya, and five others for conspiracy to distribute and possess marijuana, distribution of marijuana, maintaining a drug-involved premises, and conspiracy to commit money laundering. Kleinman moved to suppress the evidence seized by the DEA on the ground that it was obtained pursuant to a search warrant that lacked probable cause. In the alternative, Kleinman moved for an evidentiary hearing on the validity of the affidavit supporting the warrant due to alleged material omissions in the affidavit. The district court denied the motions.

At a pretrial hearing, the district court concluded that any references to medical marijuana would be irrelevant at trial because state law compliance is not a defense to federal charges. During jury selection, the district court emphasized that jurors should not question any purported conflict between federal and state law, and should consider the case under federal law only.

The jury convicted Kleinman on all counts and found that the amount of marijuana involved in the offenses exceeded 1,000 kilograms. The district court held a sentencing hearing on December 8, 2014, determined that the applicable United States Sentencing Guidelines (Guidelines) range was 188 to 235 months, and sentenced Kleinman to 211 months. Shortly after Kleinman's convictions and sentence, on December 16, 2014, Congress enacted an appropriations rider that prohibits the DOJ from expending funds to prevent states from implementing their laws authorizing the use, distribution, possession, and

cultivation of medical marijuana.  Consolidated and Further
Continuing Appropriations Act, 2015, Pub. L. No. 113–235,
§ 538, 128 Stat. 2130, 2217 (2014).

## ANALYSIS

### I.  Kleinman is not entitled to remand for an evidentiary hearing on his state law compliance.

In 1996, California voters approved the Compassionate
Use Act (CUA), which decriminalized possession and
cultivation of marijuana for medical use.  Cal. Health &
Safety Code § 11362.5.  In 2003, the California legislature
enacted the Medical Marijuana Program (MMP), permitting
qualified patients to form collectives for the cultivation and
distribution of medical marijuana.  *Id.* §§ 11362.7–11362.9.
Federal law, however, still prohibits the use or sale of
marijuana, even if distributed and possessed pursuant to
state-approved medical marijuana programs.  *See United
States v. McIntosh*, 833 F.3d 1163, 1179 n.5 (9th Cir. 2016)
("Anyone in any state who possesses, distributes, or
manufactures marijuana for medical or recreational purposes
(or attempts or conspires to do so) is committing a federal
crime.").

Since December 16, 2014, congressional appropriations
riders have prohibited the use of any DOJ funds that prevent
states with medical marijuana programs (including
California) from implementing their state medical marijuana
laws.  Consolidated and Further Continuing Appropriations
Act, 2015, 128 Stat. at 2217; Consolidated Appropriations
Act, 2016, Pub. L. No. 114–113, § 542, 129 Stat. 2242,
2332–33 (2015); Consolidated Appropriations Act, 2017,
Pub. L. No. 115-31, § 537, 131 Stat. 135, 228 (2017).  All of
these riders are "essentially the same," *see United States v.
Nixon*, 839 F.3d 885, 887 (9th Cir. 2016) (per curiam), and

the current rider will remain in effect until at least September 30, 2017. *See* Consolidated Appropriations Act, 2017, 131 Stat. at 135. In this opinion we refer to the riders collectively as § 542.

In *McIntosh* we determined that, pursuant to § 542, federal criminal defendants who were indicted in marijuana cases had standing to file interlocutory appeals seeking to enjoin DOJ expenditure of funds used to prosecute their cases. 833 F.3d at 1172–74. We held that "§ 542 prohibits DOJ from spending funds from relevant appropriations acts for the prosecution of individuals who engaged in conduct permitted by the State Medical Marijuana Laws and who fully complied with such laws." *Id.* at 1177. However, § 542 does not prohibit prosecuting individuals for conduct that is *not* fully compliant with state medical marijuana laws. *Id.* at 1178. We remanded, holding that the DOJ could only continue the prosecutions if the defendants were given "evidentiary hearings to determine whether their conduct was completely authorized by state law, by which we mean that they strictly complied with all relevant conditions imposed by state law on . . . medical marijuana." *Id.* at 1179. Kleinman asks us to remand for an evidentiary hearing as we did in *McIntosh*. We decline to do so.

Preliminarily, we clarify that the government's approach to this case is mistaken. Kleinman was convicted and sentenced shortly before § 542 was enacted. The government therefore claims that § 542 is inapplicable to Kleinman's prosecution for two reasons, neither of which is availing. First, it asserts that application of § 542 after judgment is entered would be a retroactive application of that law, when the statute was not intended to apply retroactively. However, Kleinman does not seek retroactive application of § 542. Rather, he argues that § 542 prohibits

*continued* DOJ expenditures on his case since its enactment, which in this case refers to the DOJ's ongoing litigation *on appeal*. We determined in *McIntosh* that § 542 can prohibit continued DOJ expenditures even though a prosecution was properly initiated prior to § 542's enactment, *see id.* ("The government had authority to initiate criminal proceedings, and it merely lost funds to continue them."), and the same reasoning applies to continued expenditures on a direct appeal after conviction.

Second, the government argues that under the federal savings statute, 1 U.S.C. § 109, the repeal of a statute generally does not repeal liability incurred when that statute was in effect. However, § 542 does not concern the repeal of any statute, and *McIntosh* made clear that § 542 did not change the legality of marijuana under federal law. 833 F.3d at 1179 n.5. Section 542 merely enjoins certain DOJ expenditures while it is in effect.

We make two holdings that support our conclusion that a *McIntosh* hearing is not necessary in this case. First, § 542 only prohibits the expenditure of DOJ funds in connection with a *specific charge* involving conduct that is fully compliant with state laws regarding medical marijuana. Thus, the applicability of § 542 focuses on the conduct forming the basis of a particular charge, which requires a count-by-count analysis to determine which charges, if any, are restricted by § 542. The prosecution cannot use a prosecutable charge (for conduct that violates state medical marijuana law) to bootstrap other charges that rely solely upon conduct that would fully comply with state law. Otherwise, the DOJ could sweep into its prosecution other discrete acts involving medical marijuana that fully complied with state law. That would contradict the plain meaning of § 542, which prevents the DOJ from spending

funds in a manner that would prevent the listed states "from implementing their own laws that authorize . . . medical marijuana." Consolidated Appropriations Act, 2016, 129 Stat. at 2332–33.

Second, § 542 does not require a court to vacate convictions that were obtained before the rider took effect. In other words, when a defendant's conviction was entered before § 542 became law, a determination that the charged conduct was wholly compliant with state law would *not* vacate that conviction. It would only mean that the DOJ's continued expenditure of funds pertaining to that particular state-law-compliant conviction *after* § 542 took effect was unlawful. That is because, as we explained in *McIntosh*, § 542 did not change any substantive law; it merely placed a temporary hold on the expenditure of money for a certain purpose. 833 F.3d at 1179. When § 542 took effect, the DOJ was obligated to stop spending funds in connection with any charges involving conduct that fully complied with state law, but that temporary spending freeze does not spoil the fruits of prosecutorial expenditures made before § 542 took effect. Instead, as it pertains to this case, because § 542 became law after Kleinman's conviction and sentence, but before this appeal, § 542 (if it applies at all) might operate to bar the DOJ from continuing to defend this prosecution on appeal insofar as it relates to those counts that may be determined to involve only conduct that wholly complies with California medical marijuana law.

With these two principles in mind, we conclude that a *McIntosh* hearing is not necessary in this case. We made clear in *McIntosh* that "[i]ndividuals who do not strictly comply with all state-law conditions regarding the use, distribution, possession, and cultivation of medical marijuana have engaged in conduct that is unauthorized, and

prosecuting such individuals does not violate § 542." 833 F.3d at 1178. In this case, § 542 does not apply to at least two of the charges against Kleinman because the conduct alleged therein does not fully comply with state law: conspiracy to distribute marijuana (Count 1), and conspiracy to commit money laundering (Count 6). Both counts involved marijuana sales to out-of-state customers in violation of California law.

The CUA and the MMP make clear that Kleinman has no state-law defense for his sales of approximately 85 kilograms of marijuana to out-of-state customers. The stated purpose of the CUA is "[t]o ensure that seriously ill *Californians* have the right to obtain and use marijuana for medical purposes." Cal. Health & Safety Code § 11362.5(b)(1)(A) (emphasis added). The MMP provides immunity from prosecution for possession and distribution of marijuana to qualified patients and their primary caregivers "who associate *within the State of California* in order collectively or cooperatively to cultivate cannabis for medical purposes." *Id.* § 11362.775(a) (emphasis added). The MMP further provides that a person seeking a medical marijuana identification card must show "proof of his or her residency *within the county.*" *Id.* § 11362.715(a)(1) (emphasis added). The California Attorney General's guidelines for implementing the CUA and MMP (AG Guidelines) provide that medical marijuana collectives must only sell to those within the collective, and specifically lists as "indicia of unlawful operation" sales to non-members and out-of-state distribution. Cal. Att'y Gen. Edmund G. Brown, Jr., *Guidelines for the Security and Non-Diversion of Marijuana Grown for Medical Use*, Cal. Dep't of Justice, at 8–11 (August 2008), *available at* http://www.ag.ca.gov/ cms_attachments/press/pdfs/n1601_medicalmarijuanaguide

lines.pdf; *accord People v. London*, 175 Cal. Rptr. 3d 392, 402–03 (Cal. Ct. App. 2014).

Counts 1 and 6 allege overt acts that violate the CUA and MMP; i.e., sales to out-of-state customers. Additionally, Kleinman conceded that the government presented evidence that his Philadelphia and New York customers never joined his collective, and he never argued that these customers and out-of-state sales were part of his purported medical marijuana collectives. First, he affirmed at trial that he was not going to argue that sales to out-of-state customers were "legitimate in any way in any state." Then, in his sentencing memorandum, he argued that he should only be sentenced based on the quantity of marijuana shipped to Philadelphia and New York because his *in-state transactions* were compliant with state law. Finally, at sentencing, when asked if he was "trying to defend those shipments to New York and Philadelphia" as state-law compliant medical marijuana transactions, he replied that he was "not trying to say there's any legal defense that would apply to those out-of-state shipments." Kleinman now seeks to introduce evidence that his in-state transactions complied with California law, but makes no attempt to refute that the out-of-state transactions did not. Rather, his position is that those "questionable" sales should not taint his entire marijuana operation. Thus, the record clearly demonstrates that he violated the CUA and the MMP, is not entitled to a *McIntosh* hearing in connection with Counts 1 and 6, and is not entitled to the benefits of § 542 as to those counts.

There may be some legitimate question, however, as to whether Counts 2 through 5 involved conduct that strictly

complied with California law.[1]   But there is no need to remand for a *McIntosh* hearing on those charges because even a favorable determination regarding state law compliance on Counts 2 through 5 would mean only that the DOJ was disabled from defending those specific charges on appeal.   However, Kleinman did not make any appellate arguments that were tied to those specific charges; he made only global attacks on his convictions and sentence.   Because he made no substantive arguments pertaining to Counts 2 through 5 that are not resolved by our rulings as to Counts 1 and 6, our rulings on those counts are dispositive of all charges.   Counts 1 and 6 were definitively prosecutable; thus, § 542 does not preclude the DOJ from defending against any of Kleinman's arguments on appeal, and we need not remand for a *McIntosh* hearing on Counts 2 through 5.

In summary, we decline to remand for a *McIntosh* hearing because of the unique circumstances of this case. First, Kleinman's conviction and sentence were entered *before* § 542 took effect, so § 542 had no effect on his trial and sentencing.   Thus, the only possible disability imposed on the DOJ here is the prohibition on defending the conviction and sentence *on appeal* after § 542 took effect. Second, § 542 does not bar the DOJ from spending funds in

---

[1] Counts 2, 3, 4 in the First Superseding Indictment alleged discrete marijuana transactions on certain dates, but those counts do not allege that the referenced transactions involved out-of-state customers or were otherwise conducted in violation of California law.   Count 5 alleged the operation of a drug-involved premises (NoHo), and while it might be inferred that such conduct violated California law because the same act was alleged as an overt act in furtherance of the conspiracy in Count 1, that conclusion is not obvious.   In any event, we need not decide whether there is enough uncertainty on these counts for a *McIntosh* hearing because, as we explain, it would not make a difference in the outcome of this case.

connection with Counts 1 and 6 because those charges definitively involved conduct that violated state law. Third, whether § 542 bars the DOJ's expenditure of funds to defend Counts 2 through 5 is an open question because we cannot definitively conclude that those counts involved conduct that violated State law. Fourth, *even if* § 542 applied to Counts 2 through 5—and thus the DOJ could not defend those specific counts on appeal—our rulings on Counts 1 and 6 are dispositive of *all* counts, including Counts 2 through 5, because Kleinman's substantive appellate claims concern all counts equally. Fifth, as we explain below, Kleinman does not win relief on any of his other arguments, so it is unnecessary for us to remand for a *McIntosh* hearing on Counts 2 through 5 because we would affirm those convictions regardless of whether § 542 applies to them.[2]

---

[2] Kleinman challenges the substantive reasonableness of his sentences, which he argues are disproportionate to the seriousness of his offenses. However, because all sentences run concurrently, and sentences for Counts 1 and 6 are 211 months each, any change in sentences for Counts 2 through 5 would not result in any reduction of Kleinman's 211 month sentence.

Kleinman separately argues that § 542 compels the Bureau of Prisons, as a subdivision of the DOJ, to stop spending money to incarcerate persons for medical marijuana convictions based on activity that fully complies with state law. We need not resolve this issue in this case. As we have explained, at least two of Kleinman's convictions fall outside the scope of § 542 because they involved conduct that violates California law. Those two convictions (Counts 1 and 6) carried the longest terms of imprisonment (211 months) and all terms for each count were sentenced to run concurrently. Thus, even if the DOJ could not separately continue to expend funds to incarcerate Kleinman on the remaining counts because of § 542, Kleinman's custodial status would not be changed because § 542 does not bar his continued incarceration for his conspiracy convictions. Further, Kleinman makes no argument that the Bureau of Prisons would calculate his credit for early release any

**II. The district court erred by giving an overly strong anti-nullification jury instruction, but the error was harmless.**

Kleinman claims that the anti-nullification jury instruction the district court gave prior to deliberations misstated the law and impermissibly divested the jury of its power to nullify. While we generally "review the language and formulation of a jury instruction for an abuse of discretion, . . . [w]hen jury instructions are challenged as misstatements of law, we review them *de novo*." *United States v. Cortes*, 757 F.3d 850, 857 (9th Cir. 2014).

Jury nullification occurs when a jury acquits a defendant, even though the government proved guilt beyond a reasonable doubt. *United States v. Powell*, 955 F.2d 1206, 1212–13 (9th Cir. 1992). It is well established that jurors have the *power* to nullify, and this power is protected by "freedom from recrimination or sanction" after an acquittal. *Merced v. McGrath*, 426 F.3d 1076, 1079 (9th Cir. 2005). However, juries do not have a *right* to nullify, and courts have no corresponding duty to ensure that juries are able to exercise this power, such as by giving jury instructions on the power to nullify. *Id.* at 1079–80. On the contrary, "courts have the duty to forestall or prevent [nullification], whether by firm instruction or admonition or . . . dismissal of an offending juror," because "it is the duty of juries in criminal cases to take the law from the court, and apply that

---

differently without those concurrent sentences. Thus, we do not decide in this case the impact of § 542 on the Bureau of Prisons' expenditure of funds to incarcerate persons who were convicted only of federal drug offenses involving conduct that was fully compliant with state medical marijuana laws.

law to the facts as they find them to be from the evidence." *Id.*

In this case, in instruction number 27, out of a total of 34 jury instructions, the court instructed the jurors as follows:

> You cannot substitute your sense of justice, whatever that means, for your duty to follow the law, whether you agree with it or not. It is not for you to determine whether the law is just or whether the law is unjust. That cannot be your task. There is no such thing as valid jury nullification[.] You would violate your oath and the law if you willfully brought a verdict contrary to the law given to you in this case.[3]

Kleinman argues that these instructions implied that jurors would break the law, and possibly be punished, if they did not convict, and thus divested the jury of its power to nullify.

This portion of the court's instructions was taken nearly verbatim from two cases. The first three sentences came from *United States v. Rosenthal*, 266 F. Supp. 2d 1068, 1085

---

[3] The court noted that it planned to give the instruction because, during trial, protesters in front of the courthouse were urging the jury to disregard the law. The protestors' signs said "smart jurors are hung jurors," "no victim of crime," and "judges have the law, jury has the power." During trial, the court spoke to the jurors one-by-one to determine what impact the protestors had, if any. Some jurors had not seen the signs, and for the jurors that had, the court asked if the signs influenced them, and reiterated that they should not be influenced by anything outside of the courtroom. All of the jurors were agreeable and none was dismissed. Kleinman argues that the court's individual questioning of the jurors contributed to the coercive effect of the anti-nullification instructions.

(N.D. Cal. 2003), *affirmed in part, reversed in part*, 454 F.3d 943 (9th Cir. 2006), where the district court instructed the jury "you cannot substitute your sense of justice, whatever that means, for your duty to follow the law, whether you agree with it or not. It's not your determination whether a law is just or whether a law is unjust. That can't be your task." The defendant argued that this instruction erroneously divested the jury of its power to nullify, and the district court held that the instruction was proper. *Id.* at 1085–87. The district court reasoned that, while it must instruct the jury to follow the law and it must dismiss jurors who express intent to nullify, it cannot entirely divest the jury of its power to nullify with an anti-nullification instruction. *Id.* at 1086–87. Jury nullification is, by its very definition, a jury's choice to ignore court instructions, which may include an anti-nullification instruction. *Id.* at 1087. On appeal, we agreed with the district court's analysis of the jury instruction claim and adopted its reasoning in full. *Rosenthal*, 454 F.3d at 947.[4]

The last two sentences of the instruction came from *United States v. Krzyske*, 836 F.2d 1013, 1021 (6th Cir. 1988), a case in which the defendant mentioned jury nullification in his closing argument, and during deliberations the jury asked the court about the doctrine. "The court responded, 'There is no such thing as valid jury nullification. . . . You would violate your oath and the law if you willfully brought in a verdict contrary to the law given

---

[4] Our discussion of juror misconduct in *Rosenthal* is also relevant. A juror in Rosenthal's trial spoke to an attorney friend who said that the juror "could get into trouble" if she did not follow the court's instructions, and the juror shared this outside perspective during deliberations. 454 F.3d at 950. We held that reversal was necessary because "[j]urors cannot fairly determine the outcome of a case if they believe they will face 'trouble' for a conclusion they reach as jurors." *Id.*

you in this case.'" *Id.* The Sixth Circuit rejected the defendant's argument that the instruction was coercive, noting that "[a] jury's 'right' to reach any verdict it wishes does not . . . infringe on the duty of the court to instruct the jury only as to the correct law." *Id.* The Sixth Circuit did not discuss whether the court's instructions implied that the jury would be punished for nullification, or that an acquittal that resulted from jury nullification would be void.[5]

The first three sentences of the court's anti-nullification instruction were not erroneous, and it is not generally erroneous for a court to instruct a jury to do its job; that is, to follow the court's instructions and apply the law to the facts. If Kleinman's jury had exercised its power to nullify, it presumably would have disregarded the court's instructions on federal drug law *and* the court's anti-nullification instructions. The court had no duty to make the jury aware of its power to nullify, and properly instructed the jury that it could not (1) substitute its sense of justice for its duty to follow the law, or (2) decide whether a law is just or unjust.

Although a court has "the duty to forestall or prevent [nullification]," including "by firm instruction or admonition," *Merced*, 426 F.3d at 1080, a court should *not* state or imply that (1) jurors could be punished for jury nullification, or that (2) an acquittal resulting from jury nullification is invalid. More specifically, the court's statement that the jury "would violate [its] oath and the law

---

[5] The court's statement in *Krzyske* was made in response to a question from a jury that had been urged to nullify by the defendant, and may have been an off-the-cuff answer, rather than a fully considered statement of the law. Here, on the other hand, the anti-nullification instruction was proposed by the government in advance and adopted by the court in its entirety.

if [it] willfully brought a verdict contrary to the law given to [it] in this case," could be construed to imply that nullification could be punished, particularly since the instruction came in the midst of a criminal trial. Moreover, the statement that "[t]here is no such thing as valid jury nullification" could be understood as telling jurors that they do not have the power to nullify, and so it would be a useless exercise.

As noted, in accordance with its own precedents, the Sixth Circuit found that the referenced instructions were not coercive. However, our precedents require that courts should "generally avoid[] such interference as would divest juries of their power to acquit an accused, even though the evidence of his guilt may be clear." *United States v. Simpson*, 460 F.2d 515, 520 (9th Cir. 1972). Accordingly, we find that the last two sentences of the trial court's nullification instructions were erroneous.

Kleinman argues that the last two sentences of the instruction were structural error, not subject to review for harmlessness, because they deprived him of his right to trial by an independent and impartial jury. *See Arizona v. Fulminante*, 499 U.S. 279, 306–10 (1991). In other words, Kleinman contends the district court left him to be tried by something less than a fully independent and impartial jury when the court effectively stripped the jury of its power (if not its right) to nullify. This argument fails.

"The purpose of the structural error doctrine is to ensure insistence on certain basic, constitutional guarantees that should define the framework of any criminal trial. Thus, the defining feature of a structural error is that it 'affect[s] the framework within which the trial proceeds,' rather than being 'simply an error in the trial process itself.'" *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1907 (2017) (alteration in

original) (quoting *Fulminante*, 499 U.S. at 310). Structural errors, subject to automatic reversal, deprive defendants of "basic protections," without which "a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair." *Fulminante*, 499 U.S. at 310 (quoting *Rose v. Clark*, 478 U.S. 570, 577–78 (1986)). Accordingly, they are neither common nor numerous. *See Neder v. United States*, 527 U.S. 1, 8 (1999) (recognizing that most constitutional errors are harmless and that structural errors arise in a very limited number of cases). Moreover, where a "defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other constitutional errors that may have occurred are subject to harmless-error analysis," rather than structural. *Id.* (alteration omitted) (quoting *Rose*, 478 U.S. at 579).

Recently, the Supreme Court identified three kinds of errors that may be considered structural. *See Weaver*, 137 S. Ct. at 1908. A comparison of the error in this case with those discussed by the Court demonstrates that they are not of the same kind.

First, the Court indicated that an error may be structural "if the right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other interest." *Id.* For example, the Court indicated that a structural error could arise if a defendant were denied his right to conduct his own defense, even though his exercise of that right might increase the likelihood of his conviction. *Id.* Plainly, the instant error was not of this kind, as the jury-trial right it implicated is designed precisely to protect defendants from erroneous conviction.

Second, the Court noted that an error may be structural "if the effects of the error are simply too hard to measure."

*Id.* This kind of error arises, for example, where "a defendant is denied the right to select his or her own attorney," and "the precise 'effect of the violation cannot be ascertained.'" *Id.* (quoting *United States v. Gonzalez–Lopez,* 548 U.S. 140, 149, n.4 (2006)). The Court reasoned that in such cases, "[b]ecause the government will . . . find it almost impossible to show that the error was 'harmless beyond a reasonable doubt,' the efficiency costs of letting the government try to make the showing are unjustified." *Id.* (citation omitted) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). The error in this case does not fit within this category either. In most cases involving improper jury instruction, the Supreme Court has affirmed the appropriateness of harmless-error review, distinguishing a case like *Sullivan v. Louisiana*, 508 U.S. 275 (1993), where there was *no* verdict to subject to harmless-error review, from cases where there *is* a verdict, but it is somehow deficient. *See, e.g.*, *Neder*, 527 U.S. at 8–13 (collecting cases where elements of an offense were misdescribed in or omitted from jury instructions and harmless-error review was applied); *Yates v. Evatt*, 500 U.S. 391, 402–04 (1991); *Carella v. California*, 491 U.S. 263, 265–66 (1989) (per curiam); *Pope v. Illinois*, 481 U.S. 497, 503 (1987); *Rose*, 478 U.S. at 578–80. There is no reason to distinguish the instant case from the many cases involving jury instruction error in which the Court has found harmless error review appropriate. Here, we have a jury verdict, and a record of both the trial evidence and jury instructions. Nothing precludes our determination of the harmlessness (or not) of the erroneous jury-nullification instruction.

Third, the *Weaver* Court held that an error may be structural "if the error always results in fundamental unfairness." 137 S. Ct. at 1908. The Court noted, for example, that "if an indigent defendant is denied an attorney

or if the judge fails to give a reasonable-doubt instruction, the resulting trial is always a fundamentally unfair one." *Id.* The error here was not of this kind for at least three reasons: (1) It was not an error of the same magnitude as, for example, the denial of an attorney to an indigent defendant. *See id.* (2) The error did not leave us with "no object, so to speak, upon which harmless-error scrutiny can operate," *Sullivan*, 508 U.S. at 280–81 (emphasis omitted), since we still have a proper jury verdict and may determine whether the nullification instruction played any significant role in the jury's finding of guilt beyond a reasonable doubt.   And (3) Kleinman has no constitutional right to jury nullification, in contrast to indigent defendants who have a right to an attorney, and all defendants who have a right to be convicted only upon a finding of guilt beyond a reasonable doubt. Indeed, if a jury nullification instruction "always results in fundamental unfairness," then we and our sister circuits have allowed structural errors to go unchecked for decades.

Having determined that the district court's jury nullification instruction did not amount to a structural error, we next proceed to the second step of our analysis, at which we must determine whether the district court's error was constitutional in nature.  If an error is constitutional, the rule announced in *Chapman* applies and an error may only be deemed harmless if its harmlessness is clear beyond a reasonable doubt. *See United States v. Perkins*, 937 F.2d 1397, 1407 n.2 (9th Cir. 1991) (O'Scannlain, J., dissenting) (describing three possible levels of harmless-error scrutiny in the criminal context); *United States v. Valle-Valdez*, 554 F.2d 911, 915 (9th Cir. 1977).    By contrast, "nonconstitutional errors are measured against the more-probable-than-not standard." *Valle-Valdez*, 554 F.2d at 916 (9th Cir. 1977); *see also Kotteakos v. United States*, 328 U.S. 750, 765 (1946) (holding that nonconstitutional error is

reversible "if one cannot say, with fair assurance, . . . that the judgment is not substantially swayed by the error"); *United States v. Hernandez*, 476 F.3d 791, 801 (9th Cir. 2007).

As we previously stated, there is no constitutional right to jury nullification, and it is not a constitutional error to give a "firm instruction or admonition," in an attempt to "forestall or prevent" nullification. *Merced*, 426 F.3d at 1079–80 (quoting *United States v. Thomas*, 116 F.3d 606, 616 (2d Cir. 1997)). However, to the extent the district court's erroneous instruction improperly infringed on "the historical and constitutionally guaranteed right of criminal defendants to demand that the jury decide guilt or innocence on every issue, which includes application of the law to the facts," *United States v. Gaudin*, 515 U.S. 506, 513 (1995), implying that a particular decision might result in some type of punishment, *see Merced*, 426 F.3d at 1079, the error took on a constitutional dimension. While it is permissible under our law for judges to attempt to forestall or prevent nullification by use of a firm instruction or admonition, it was not proper here for the district court to do so in a way that might be perceived as coercive with regard to the jury's ultimate verdict.

In light of that fact, we will evaluate the trial court's two-sentence instructional error according to *Chapman*'s beyond-a-reasonable-doubt standard. The question we must answer is whether the Government has proved beyond a reasonable doubt that the district court's erroneous two-sentence instruction, which implied that jurors could face a legal consequence for nullification, did not contribute to the guilty verdict. *See Chapman*, 386 U.S. at 24.

In this case, the Government has made the required showing. There is no dispute regarding the adequacy of the district court's jury instructions as a whole, and the

Government has demonstrated that the erroneous two-line nullification instruction was an anomaly, as the district judge's other instructions appropriately explained the jurors' role, powers, and responsibilities. The erroneous two-sentence nullification instruction was a small part of the court's final instructions to the jury, and was delivered without particular emphasis. Moreover, the court's other instructions informed the jurors that the ultimate-verdict decision was entirely theirs to make, that a guilty verdict required a finding of guilt beyond a reasonable doubt after a careful and impartial consideration of the evidence, that they should not be afraid to change their minds, and that they should reach their own conscientious decisions.

Given this context, the nullification instruction was a harmless error. If the two-sentence instruction was coercive at all, it was only coercive insofar as it implied recrimination in the event a verdict was reached contrary to the law. Because the Government has shown that the verdict here was reached in a manner consistent with the law, we are confident that the instruction had no effect on the jury's verdict. The verdict would have been the same absent the district court's error, because the evidence of Kleinman's guilt would have been the same, the judge's instructions on the law would have been the same, and the jury would have had no more right to reach a nullifying verdict than it did here. *See, e.g.*, *United States v. Conti*, 804 F.3d 977, 981 (9th Cir. 2015) ("Where a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless." (alteration omitted) (quoting *Neder*, 527 U.S. at 8)); *Merced*, 426 F.3d at 1079 ("[W]hile jurors have the power to nullify a verdict, they have no right to do so."); *see also Rose*,

478 U.S. at 580 (noting that erroneous presumption regarding malice only attached if the jury already found predicate facts to exist beyond a reasonable doubt).[6] The district court's error was harmless.

**III.    The district court did not err by denying Kleinman's motion to suppress evidence seized pursuant to a state search warrant.**

The LAPD seized evidence pursuant to a search warrant and supporting affidavit dated March 16, 2010, and the DEA later seized that evidence. Kleinman moved to suppress the evidence, arguing that the seizure violated his Fourth Amendment rights because the affidavit supporting the search warrant did not support the magistrate's probable cause finding. The district court denied the motion. We review the denial de novo, and any underlying factual findings for clear error. *United States v. Rodgers*, 656 F.3d 1023, 1026 (9th Cir. 2011).

"[P]robable cause means a fair probability that contraband or evidence is located in a particular place. Whether there is a fair probability depends upon the totality of the circumstances, including reasonable inferences, and is a commonsense, practical question. Neither certainty nor a preponderance of the evidence is required." *United States v. Kelley*, 482 F.3d 1047, 1050 (9th Cir. 2007) (internal citations and quotation marks omitted). We give a

---

[6] Kleinman asserts that if the error is not structural, "[w]e apply a 'totality of the circumstances' analysis when examining whether a judge's statements to a jury were impermissibly coercive." *United States v. Berger*, 473 F.3d 1080, 1090 (9th Cir. 2007). However, the framework that Kleinman identifies is inapplicable here; it applies when we assess whether an *Allen* charge was impermissibly coercive. *Id.* at 1089; *see also Allen v. United States*, 164 U.S. 492, 501–02 (1896).

magistrate's determination that probable cause exists "great deference." *Id.*

The affidavit supporting the search warrant described the LAPD officers' undercover visit to Medco in 2010. Officer Cecil Mangrum stated that, after he and his partner entered Medco, a Medco employee said that to participate in the collective Officer Mangrum "did not have to do anything except show [his] ID and doctor recommendation every time [he] came in," and that not everyone in the collective was required to grow marijuana. The officers purchased marijuana at Medco that day using United States currency. Officer Mangrum alleged the following probable violations of California law: (1) Medco did not require members to participate in the collective, in violation of the CUA and MMP; (2) the Medco employee exchanged marijuana solely for money, in violation of California Health and Safety Code § 11360; and (3) Medco requires collective members to designate Medco as their primary caregiver, in violation of *People v. Mentch*, 195 P.3d 1061 (Cal. 2008).

California Health and Safety Code § 11360 prohibits selling marijuana, except as authorized by law. Thus, selling marijuana is illegal under § 11360 *unless* the MMP authorized such sales. While the MMP does not "authorize any individual or group to cultivate or distribute marijuana for profit," *id.* § 11362.765(a), it also does not prohibit exchanging money for marijuana among members of a collective. Consistent with the MMP, "a primary caregiver [may] receive compensation for actual expenses and reasonable compensation for services rendered to an eligible qualified patient, i.e., conduct that would constitute sale under other circumstances." *People v. Urziceanu*, 33 Cal. Rptr. 3d 859, 883 (Cal. Ct. App. 2005); *see also* AG Guidelines at 10. Further, the MMP does not require that

collective members grow marijuana in order to be considered participants of the collective. *See People v. Anderson*, 182 Cal. Rptr. 3d 276, 277 (Cal. Ct. App. 2015). Thus, the statements in the affidavit that Medco exchanged marijuana solely for money and did not require members to grow marijuana do not support the inference that Medco was operating in violation of state law.

However, the affidavit *did* establish probable cause to believe that Medco was violating state law because it stated that marijuana purchasers were required to designate Medco as their primary caregiver. Although Officer Mangrum's description of the Medco visit did not specifically state that he designated Medco as his primary caregiver, this designation can reasonably be inferred because he averred that Medco required such a designation from its members, and that he purchased marijuana from Medco that day.[7]

Primary caregiver is defined by the CUA and MMP as an individual "who has consistently assumed responsibility for the housing, health, or safety of" a medical marijuana patient who designated said individual as her primary caregiver. Cal. Health & Safety Code §§ 11362.5(e), 11362.7(d). While the general definition is the same in the CUA and MMP, the MMP "provides an expanded definition of what constitutes a primary caregiver" by including examples of qualifying primary caregivers. *Urziceanu*,

---

[7] Indeed, even if it could not reasonably be inferred from the affidavit that the officers designated Medco as their primary caregiver when they purchased marijuana, a probable violation of California law would still be apparent, because the officers would have purchased from a purported collective without even nominally becoming members of that collective.

33 Cal. Rptr. 3d at 881–82; *see also* Cal. Health & Safety Code § 11362.7(d).

The California Supreme Court held that to be a primary caregiver under the CUA, a person "must prove at a minimum that he or she (1) consistently provided caregiving, (2) independent of any assistance in taking medical marijuana, (3) at or before the time he or she assumed responsibility for assisting with medical marijuana." *Mentch*, 195 P.3d at 1067. The court in *People v. Hochanadel*, 98 Cal. Rptr. 3d 347, 361–62 (Cal. Ct. App. 2009), further explained that, under the MMP, collective owners "do not, [merely] by providing medical patients with medicinal marijuana, consistently assume responsibility for the health of those patients" sufficient to be considered a primary caregiver. Rather, "[t]here must be evidence of an existing, established relationship, providing for housing, health or safety independent of the administration of medical marijuana." *Id.* at 362 (internal quotation marks omitted). Moreover, the AG Guidelines state that, although a lawful medical marijuana collective may use a storefront to dispense medical marijuana, dispensaries "are likely unlawful" if they "merely require patients to complete a form summarily designating the business owner as their primary caregiver." AG Guidelines at 11.

As described in the affidavit, Medco's practice of requiring members to designate Medco as their primary caregiver and then allowing members to purchase marijuana immediately after, with no preexisting or other relationship beyond the distribution of marijuana, provides probable cause to believe that Medco was operating illegally. When the warrant was issued in 2010, the CUA, MMP, California state court decisions, and the AG Guidelines all supported the conclusion that Medco's "primary caregiver"

designation practice was unlawful. Thus, the district court did not err by denying Kleinman's motion to suppress.

## IV.  The district court did not err by denying Kleinman's motion for a *Franks* hearing.

Kleinman requested, and was denied, a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978) (i.e., a *Franks* hearing). We review the court's denial de novo. *United States v. Flyer*, 633 F.3d 911, 915–16 (9th Cir. 2011). A *Franks* hearing is "an evidentiary hearing on the validity of the affidavit underlying a search warrant" that a defendant is entitled to if he "can make a substantial preliminary showing that (1) the affidavit contains intentionally or recklessly false statements or misleading omissions, and (2) the affidavit cannot support a finding of probable cause without the allegedly false information"; i.e., the challenged statements or omissions are material. *United States v. Reeves*, 210 F.3d 1041, 1044 (9th Cir. 2000). "If both requirements are met, the search warrant must be voided and the fruits of the search excluded." *United States v. Perkins*, 850 F.3d 1109, 1116 (9th Cir. 2017) (internal quotation marks omitted).

Kleinman argues that Officer Mangrum's affidavit contained misleading omissions of facts that would have demonstrated that Kleinman complied with state law. The affidavit did not mention that, when the officers entered Medco, security guards checked their ID cards and doctors' recommendations, verified the doctors' recommendations, and had the officers complete membership applications. Officer Mangrum revealed these details when he testified at a state court hearing.

Regardless of whether Kleinman made a substantial preliminary showing that Officer Mangrum's omissions were made recklessly or intentionally, a *Franks* hearing is

not warranted because the omissions were not material to the probable cause determination.  In considering the materiality of an alleged omission, we ask "whether probable cause remains once the evidence presented to the magistrate judge is supplemented with the challenged omissions." *Id.* at 1119.

If the affidavit stated the omitted information about IDs, doctors' recommendations, and membership applications, the probable cause finding would still be valid.  The affidavit stated that a Medco employee told Officer Mangrum that he would have to show IDs and doctors' recommendations every time he came in, and that Medco requires collective members to designate Medco as their primary caregiver. Since the officers purchased marijuana from Medco that day, one can reasonably infer that the omitted acts occurred, and the affidavit does not suggest that they did not.  In addition, regardless of whether Medco properly verified the officers' IDs and doctors' recommendations, the probable cause finding was supported because the affidavit stated that Medco required members to designate Medco as their primary caregiver, in violation of state law.  *See* Part III, *supra.*    Thus, Kleinman cannot make a substantial preliminary showing that the omitted facts were material, and thus is not entitled to a *Franks* hearing.

## V.  The district court did not err by declining to instruct the jury on Kleinman's joint ownership defense.

Based on *United States v. Swiderski*, 548 F.2d 445 (2d Cir. 1977), Kleinman sought a jury instruction that "[w]here a group of individuals jointly purchase and then simultaneously and jointly acquire possession of a drug for their own use intending only to share it together, they cannot be found guilty of the offense of distribution of the drug." The district court refused to give the instruction, and Kleinman argues that this refusal deprived the jury

instruction on his theory of defense. "We review whether a trial court's instructions adequately covered a defendant's proffered defense de novo." *United States v. Morsette*, 622 F.3d 1200, 1201 (9th Cir. 2010) (per curiam).

The court did not err by refusing to instruct the jury on the joint ownership defense because, although "a defendant is entitled to have the judge instruct the jury on his theory of defense," the defense must be "supported by law and [have] some foundation in the evidence." *United States v. Kayser*, 488 F.3d 1070, 1073 (9th Cir. 2007). We have expressly declined to adopt or reject the *Swiderski* joint ownership defense in this circuit. *See United States v. Wright*, 593 F.2d 105, 108 (9th Cir. 1979). Even if we had accepted the defense, it would only apply "where two individuals simultaneously and jointly acquire possession of a drug for their own use, intending only to share it together," *Swiderski*, 548 F.2d at 450, and no reasonable jury could conclude that this defense fits the facts of Kleinman's case. Thus, the court did not err by declining to instruct the jury on a defense theory that is not supported in the law of our circuit, and, even if it was, has no foundation in the evidence. *See Kayser*, 488 F.3d at 1073.

## VI.   The district court did not abuse its discretion by considering the government's late-filed objections to the presentence report.

Kleinman argues that the court failed to comply with Federal Rule of Criminal Procedure 32(f)(1), which provides that "[w]ithin 14 days after receiving the presentence report [PSR], the parties must state in writing any objections." The Probation Office filed its revised PSR on September 17, 2014, and, although the government requested and was granted an extension of time to file objections by October

27, 2014, it did not file its objections until December 4, 2014.  Sentencing was on December 8, 2014.

We have stated that we review a district court's compliance with Rule 32 de novo, and that Rule 32 "requires strict compliance."  *United States v. Thomas*, 355 F.3d 1191, 1194, 1200 (9th Cir. 2004).  However, this was in the context of determining if a district court made required Rule 32 findings on objections to the PSR that are unresolved at sentencing.  *See, e.g., id.* at 1200; *United States v. Carter*, 219 F.3d 863, 866 (9th Cir. 2000); *United States v. Houston*, 217 F.3d 1204, 1206–07 (9th Cir. 2000).  We have not stated the standard of review for an alleged Rule 32(f)(1) violation.

Rule 32(i)(1)(D) allows a court at sentencing to, "for good cause, allow a party to make a new objection at any time before sentence is imposed," and the "good cause" standard has been understood as a grant of discretion to district courts.  *See, e.g.*, *United States v. Angeles-Mendoza*, 407 F.3d 742, 749 (5th Cir. 2005).  Although Rule 32(i)(1)(D) applies at sentencing, the discretion it gives for a court to consider late-raised sentencing objections logically extends to allowing a court to consider late-filed written objections for good cause.  Thus, we review for abuse of discretion the court's decision to consider the government's late-filed objections.

The court did not abuse its discretion by considering the government's objections to the PSR.  First, the court was within its discretion to determine that the government showed good cause.  The government took issue with the PSR's determination that Kleinman was not eligible for a leadership role enhancement, and requested additional time to review hundreds of pages of trial transcripts to fully respond to the PSR.  At sentencing, the court acknowledged

that the PSR contained numerous errors and that the government needed time to fully respond.

Second, even if the government did not show sufficient good cause, Kleinman was not prejudiced by the court's consideration of late-filed objections. Kleinman was put on notice that the government planned to object to the PSR's leadership role enhancement conclusion months before sentencing. The day after the Probation Office filed its revised PSR, the government filed an ex parte motion for extension of time, specifically stating that it took issue with the leadership role conclusion, and had ordered transcripts to adequately respond to the PSR and Kleinman's sentencing position. Additionally, the court stated at sentencing that its conclusion that there was "no question" that the leadership role enhancement applied was primarily based on its own memory and notes from trial, rather than the PSR or the parties' sentencing positions.

## VII.   Kleinman's 211 month sentence is substantively and procedurally reasonable.

Kleinman argues that his 211 month sentence is procedurally and substantively unreasonable. We review a sentence for procedural and substantive reasonableness, and sentencing decisions for abuse of discretion. *United States v. Carty*, 520 F.3d 984, 993 (9th Cir. 2008). Although we have "decline[d] to embrace a presumption" of reasonableness for in-Guideline sentences, when a sentence is within Guidelines, it is generally "probable that the sentence is reasonable." *Id.* at 994. Kleinman does not dispute that his sentence was within Guidelines.

First, Kleinman argues that he was punished at sentencing for going to trial, as evidenced by the shorter sentences of his co-defendants, who did not go to trial. "It

is well settled that an accused may not be subjected to more severe punishment simply because he exercised his right to stand trial," and "courts must not use the sentencing power as a carrot and stick to clear congested calendars, and they must not create an appearance of such a practice." *United States v. Medina-Cervantes*, 690 F.2d 715, 716 (9th Cir. 1982). In *Medina-Cervantes*, for example, we held that the court's statements criticizing the defendant for going to trial and estimating the costs of the trial warranted vacating the sentence. *Id.* at 716–17.

Five of Kleinman's six co-defendants were sentenced to probation, and Montoya was sentenced to 37 months. All six co-defendants pleaded guilty and cooperated with the government during trial. Additionally, all but Montoya had a lesser role in the conspiracy than Kleinman. While the sentencing disparities are apparent, Kleinman has offered no evidence to warrant the inference that the longer sentence was imposed to punish Kleinman for going to trial. There are clear reasons for the sentencing disparities, and the court stated during sentencing that it "analyzed the sentences imposed on others who have either pled or been found guilty in this case in order to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."

Kleinman additionally argues that the court procedurally erred because it did not state with sufficient specificity its reason for imposing a significantly disparate sentence. We review for plain error because Kleinman failed to raise this procedural objection before the district court. *United States v. Valencia-Barragan*, 608 F.3d 1103, 1108 (9th Cir. 2010). "[A] sentencing judge does not abuse [its] discretion when [it] listens to the defendant's arguments and then simply [finds the] circumstances insufficient to warrant a sentence

lower than the Guidelines range." *Id*. (internal quotation marks omitted). The court listened to Kleinman's arguments, stated that it reviewed the statutory sentencing criteria, and imposed a within-Guidelines sentence; "failure to do more does not constitute plain error." *Id.*

Finally, Kleinman argues that his sentence is substantively unreasonable because it "is far greater than necessary to reflect the seriousness of this medical marijuana offense," when there is now "overwhelming public opinion that medical marijuana is not a danger to the public." Even if this were properly considered a medical marijuana case, the court did not err by imposing a within-Guidelines sentence based on violations of federal law. Although a court may have the discretion to depart from Guidelines based on policy disagreements, it is not obligated to do so. *See, e.g*., *United States v. Henderson*, 649 F.3d 955, 964 (9th Cir. 2011).

## CONCLUSION

We conclude that the district court erred by instructing the jury that "[t]here is no such thing as valid jury nullification," and that it "would violate [its] oath and the law if [it] willfully brought a verdict contrary to the law given to [it] in this case." However, because there is no right to jury nullification, the error was harmless. We find that Kleinman's remaining challenges on appeal are without merit, and AFFIRM his conviction and sentence.