**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee*,

v.

JAVIER PEREZ, AKA Ranger,
  *Defendant-Appellant.*

No. 13-50014

D.C. No.
2:07-cr-01172-
DDP-32

---

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee*,

v.

VLADIMIR ALEXANDER IRAHETA,
AKA Jokes, AKA Slick, AKA the
Twin,
  *Defendant-Appellant.*

No. 15-50241

D.C. No.
2:07-cr-01172-
DDP-25

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee*,

v.

LEONIDAS IRAHETA, AKA Druggy,
AKA Drugs, AKA Shysty, AKA the
Twin,
            *Defendant-Appellant.*

Nos.  15-50243
        18-50187

D.C. No.
2:07-cr-01172-
DDP-26

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee*,

v.

EDUARDO HERNANDEZ,
            *Defendant-Appellant.*

No. 15-50246

D.C. No.
2:07-cr-01172-
DDP-23

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee*,

                    v.

EDUARDO HERNANDEZ, AKA Ed
Garcia, AKA Eduardo Garcia, AKA
Eduardo Hernadez, AKA Eduardo
Perez Hernandez, AKA Edward
Hernandez, AKA Lil Oso, AKA
Jorge Mateo Martinez, AKA Oso,
AKA Hernandez Oso, AKA Edward
Perez, AKA Terco,
          *Defendant-Appellant*.

No. 18-50181

D.C. No.
2:07-cr-01172-
DDP-23

OPINION

Appeal from the United States District Court
for the Central District of California
Dean D. Pregerson, District Judge, Presiding

Argued and Submitted February 10, 2020
Pasadena, California

Filed June 11, 2020

Before:  Marsha S. Berzon, Richard C. Tallman,
and Ryan D. Nelson, Circuit Judges.

Opinion by Judge Tallman

# SUMMARY[*]

## Criminal Law

In appeals arising from the prosecution of four members of the Columbia Lil Cycos clique of the 18th Street gang, the panel affirmed the convictions of Eduardo Hernandez, Leonidas Iraheta, and Vladimir Iraheta; affirmed in part and reversed in part the convictions of Javier Perez; vacated Perez's sentence; and remanded for resentencing.

The panel held that a post-verdict filing made in camera by a third party did not contain *Brady* material, and the district court did not abuse its discretion in declining to allow Leonidas's and Hernandez's attorneys to view it.

Leonidas and Hernandez claimed that the government surreptitiously elicited expert testimony from law-enforcement officers in violation of Fed. R. Evid. 701. Observing that the district court diligently patrolled the line between lay and expert testimony, the panel concluded that in the few instances in which admission of the witnesses' testimony was error, appellants suffered no prejudice.

Perez alleged that the district court improperly instructed the jury on the extraterritorial application of the Violent Crimes in Aid of Racketeering (VICAR) statute. The panel explained that VICAR may reach a crime committed abroad with sufficient nexus to the conduct of an enterprise's affairs, but if the predicate crimes cannot reach foreign conduct,

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

neither may VICAR. Because the predicate crimes with which Perez was charged—California's attempted murder statute and its definitional components—do not proscribe extraterritorial acts, the panel held that the district court erred in instructing the jury that it is not necessary for the government to prove that any part of the charged crime took place within the United States. The panel wrote that this error has a constitutional due process dimension: it relieved the United States of the burden of proving the required connection between American territorial jurisdiction and the crimes in the challenged counts for which Perez stood trial in the Central District of California. The panel therefore evaluated whether the instructional error was harmless beyond a reasonable doubt. The panel concluded that the instructional error was harmless as to Count Sixteen (VICAR conspiracy to murder) because (1) there was evidence of the conspiracy's origin in California; (2) the jury's special finding as to the date that the conspiracy began was strong evidence it believed that the plan was hatched in California; and, most importantly (3) as to that count, the jury was correctly instructed that, in order to convict, it must find that "an overt act was committed *in this state* by one or more of the persons" involved. The panel held that the instructional error was not harmless beyond a reasonable doubt as to Count Eighteen (VICAR attempted murder), where no contrary instruction cured the initial error.

The panel rejected sufficiency-of-the-evidence challenges to Hernandez's and the Iraheta brothers' narcotics-conspiracy convictions and Perez's conspiracy convictions.

At sentencing, the panel held that the district court erred in its application of a firearm enhancement to Hernandez, but that this error was harmless. The panel rejected Hernandez

and Leonidas's objections to the district court's drug-weight calculation, application of a threat enhancement, explication of 18 U.S.C. § 3553(a) factors, and use of judicial fact-finding. The panel rejected Leonidas's objection to a firearm enhancement and his argument that the district court violated Fed. R. Crim. P. 32. The panel rejected Hernandez's objection to the district court's application of obstruction-of-justice and managerial-role enhancements, and rejected Hernandez's and Leonidas's arguments that their life sentences are substantively unreasonable.

## COUNSEL

Katherine Kimball Windsor (argued), Law office of Katherine Kimball Windsor, Pasadena, California, for Defendant-Appellant Eduardo Hernandez.

Lawrence Jay Litman (argued), Riverside, California, for Defendant-Appellant Javier Perez.

Phillip A. Treviño, Los Angeles, California, for Defendant-Appellant Vladimir Alexander Iraheta.

Timothy A. Scott and Nicolas O. Jimenez, Scott Trial Lawyers APC, San Diego, California; for Defendant-Appellant Leonidas Iraheta.

Julia L. Reese (argued) and Kevin M. Lally, Assistant United States Attorneys; Brandon D. Fox, Chief, Criminal Division; Nicola T. Hanna, United States Attorney; United States Attorney's Office, Los Angeles, California; for Plaintiff-Appellee.

**OPINION**

TALLMAN, Circuit Judge:

This is a criminal appeal from judgments of conviction and sentence rendered in the Central District of California arising from the prosecution of four members of a violent street gang. We affirm the convictions and sentences of Appellants Eduardo Hernandez, Leonidas Iraheta, and Vladimir Iraheta. We affirm in part and reverse in part the convictions of Appellant Javier Perez, vacate his sentence, and remand for further proceedings.

I

The Columbia Lil Cycos (CLCS) clique of the 18th Street gang controlled drug distribution, committed extortion, and engaged in other illegal activities in the Westlake neighborhood of Los Angeles from at least the mid-1990s. CLCS and allied gangs operate under the umbrella of the Mexican Mafia (the "Eme"), a prison-based gang whose members, once behind bars, continue to oversee the street gangs with which they were affiliated before their incarceration.

When a street vendor defied CLCS's extortion regime in September of 2007, the gang sent a gunman to murder him for his impunity. But one bullet missed the vendor and tragically killed 21-day-old Luis Angel Garcia. Baby Garcia's death provoked an outcry for action from the community and triggered a massive law enforcement response. An initial federal indictment of eighteen CLCS members and associates soon issued. The fourth superseding indictment—the operative pleading here—charged a total of twenty-four defendants with twenty-one counts of racketeering, drug trafficking, money laundering,

murder, assault, maiming, kidnapping, and various conspiracies and attempts to do the same. By the time of trial in early 2012, only these four Appellants remained to be tried. Their confederates all pleaded guilty, and several—including former CLCS leaders Sergio Pantoja, James Villalobos, and Jose Delaguila—testified for the government at Appellants' trial.

The trial began on February 29, 2012. Appellants were tried together on the theory that they were all members of an illegal enterprise which carried out its nefarious activities through a pattern of racketeering activity. The criminal endeavors of Hernandez, Leonidas Iraheta ("Leonidas"), and his twin brother Vladimir Iraheta ("Vladimir"), on the one hand, and Perez on the other, were different: Hernandez and the Iraheta twins were convicted for their roles in running CLCS's narcotics and extortion activities, while Perez's convictions arose out of his participation in a conspiracy to kidnap and murder the gunman responsible for baby Garcia's death, Giovanni Macedo, to protect CLCS from reprisals by the Eme for the infant's murder.

*The CLCS Enterprise*

By the mid-1990s, CLCS had come to dominate the Westlake/MacArthur Park neighborhood of Los Angeles, between Beverley Avenue and Wilshire Boulevard (north to south) and Alvarado Street and Burlington Avenue (west to east). A constituent clique of the broader 18th Street gang, CLCS fought the Mara Salvatrucha and, especially, Rockwood Street gangs for primacy in Westlake. CLCS ran a sophisticated drug-trafficking and extortion racket in its territory. Drug wholesalers ("mayoristas") and street-level dealers ("traqueteros") paid CLCS "rent" for the right to sell drugs—mostly crack cocaine—on the street corners near MacArthur Park. The dealers were strictly controlled: a

traquetero who broke CLCS rules by selling outside his allotted shift or skimming money off his collections was liable to be savagely beaten. Other illegal businesses—document forgers, gamblers—paid rent to CLCS, too, as did many legitimate businesses in the neighborhood, under threat of violence.

CLCS ruthlessly defended its territory from encroachment. Armed bands of roving, gang-affiliated youths ("little homies") were expected to "put in work" by marking CLCS territory with copious graffiti and undertaking expeditions into rival neighborhoods to show strength and disrespect. Violence abounded: if a rival gang passed through CLCS streets or marked them with graffiti, gang leaders expected associates to "[j]ump them," or, as one CLCS leader put it, to give them "[a]n ass beating that . . . maybe he can't get up off the floor and . . . sometimes if you have a gun or you have a knife . . . you either just stab them or you shoot them."

Witnesses for the government put Hernandez and the Iraheta twins at the center of both CLCS "gangbanging"—meaning tagging, enforcing, and countering rivals—and drug distribution. Hernandez led the collection of rents at a lucrative drug-dealing hub, Westlake, from Third to Sixth Streets, in addition to overseeing gangbanging. One witness called him "the ultimate decisionmaker" on "what to do if any problems occurred—meaning enemies coming into our neighborhood or . . . homeboys going against homeboys or whatever." Leonidas and Vladimir served as Hernandez's "muscle," assisting him with rent collection and leading

"missions" into rival territory to "go do something to a rival gang or to someone else; rob, tag on the walls, anything."[1]

CLCS was led by Francisco Martinez, who—despite being incarcerated at the "Supermax" federal prison complex in Florence, Colorado—maintained control over CLCS and other Los Angeles 18th Street cliques from his cell. Originally a member of CLCS himself, Martinez was convicted of "[r]acketeering and a bunch of murders" in the 1990s and thereupon joined the Eme, which continues to wield control over most of the Hispanic gangs of Southern California. Martinez maintained his grip over CLCS with the help of disgraced attorney Isaac Guillen, who testified for the government in Appellants' trial. Guillen used the shield of the attorney–client privilege to circumvent Florence's security procedures, secreting and passing information and orders to and from Martinez and CLCS's street leaders.

CLCS leaders, including Hernandez and both Irahetas, would divvy up all the rent collected, section off Martinez's share—usually $5,000 to $17,000 a week—and deliver it to Guillen. Guillen would launder the money by investing it in a variety of businesses, funneling it to Martinez's relatives in Mexico, or putting it on Martinez's inmate "books" at Florence. This scheme enriched Martinez and enabled him to continue to exercise control over this lucrative and violent Los Angeles neighborhood.

---

[1] Appellants dispute their roles in CLCS's narcotics regime; where relevant, we address their contentions below. We recount the facts in the light most faithful to the jury's verdict.

*The Garcia Murder and its Aftermath*

Francisco Clemente sold black-market goods at a street stand in CLCS territory.  He got on the wrong side of CLCS leaders by acting disrespectfully and refusing to pay rent.  In the summer of 2007, CLCS leader Pantoja tired of Clemente and chased him out of the neighborhood, telling rent-collector Juan Pablo Murillo to "take care of it" if Clemente returned.  When Clemente did return, Murillo enlisted Macedo—then 18 years old—to show Clemente what became of those who defied CLCS.  Late at night on September 15, 2007, Macedo and Murillo made their way to Clemente's stand on Sixth Street, and Macedo fired several shots at him.  Clemente was wounded but survived.  21-day-old Garcia was not so lucky—he was struck and killed by a stray bullet.

When he found out what had happened, Pantoja testified that he told Murillo the latter had "fucked up" by killing baby Garcia, violating the Eme's strict code against murdering infants and potentially triggering a gang-wide "green light" whereby all CLCS members would become targets for murder by other Eme-affiliated gangs.  Pantoja told Murillo that Macedo "had to be dealt with."  Murillo, a member of an allied 18th Street clique—South Central—enlisted the help of fellow South Central member Javier Perez.  At around 10 p.m. on September 19, Murillo and Perez went to the home of another South Central member, Flor Aquino, and demanded the use of her Chevrolet Tahoe, purportedly to take Macedo to San Diego to hide out.  Aquino reluctantly agreed, but decided she would do the driving.  Murillo and another gang member went to Macedo's apartment, ordered him into the car, and drove away before informing him they were taking him to Mexico.  They met up with Aquino and Perez at Aquino's home, and

together Murillo, Perez, Aquino, and Macedo departed for Mexico.

Across the border in Tijuana the next day, Aquino stayed with Macedo in the hotel while Murillo and Perez met up with Pantoja, who had gone to Tijuana, he said, to ensure Macedo was properly taken care of. Murillo assured Pantoja he and Perez would "handle it," and showed Pantoja a gun. Perez and Murillo returned to the hotel and took Macedo out drinking, then back to the hotel. Later that night, Perez, Murillo, Macedo, and Aquino drove toward Mexicali through the Sierra Juárez mountains on a cliffside highway, with Macedo in the front passenger seat. Perez and Murillo—seated in the back seat while Aquino drove—grabbed a rope, threw it around Macedo's neck, and began to strangle him. Murillo told Macedo he had messed up; Perez was less circumspect: he yelled, "Die motherfucker, die!"

After strangling Macedo until he was bloodied, Perez and Murillo checked to see if Macedo was still alive. Believing him dead, Murillo and Perez dragged Macedo out of the car and threw him over the cliffside. But Macedo was alive: he woke up sliding down the cliff, grabbed a tree root to check his fall, climbed back up to the road, managed to hail a ride, and returned to the United States. He later testified against Perez at trial.

After thirty-one trial days, the case was submitted to the jury on May 3, 2012, and after several days of deliberation, the jury returned a mixed verdict. Appellants were all convicted of Count One (RICO conspiracy, 18 U.S.C. § 1962(d)); Hernandez and the Iraheta brothers were convicted of Count Two (narcotics conspiracy, 21 U.S.C. § 841(a)(1), (b)(1)(A)(iii); *id.* § 846); and Perez was convicted of Counts Sixteen (conspiracy to murder under

18 U.S.C. § 1959, the Violent Crimes in Aid of Racketeering Statute, known as "VICAR"), Seventeen (VICAR conspiracy to kidnap, *id.*), Eighteen (VICAR attempted murder, *id.*), and Twenty (conspiracy to kidnap, 18 U.S.C. § 1201(a)(1), (c)). The jury hung on the VICAR murder count that accused Hernandez and the Iraheta twins of the 2001 murder of Jose Barajas, Jr., and it acquitted Perez of both kidnapping and VICAR kidnapping.

*Sentencing*

Prior to sentencing, the United States Probation Office completed Presentence Reports (PSRs) for all Appellants. All parties filed objections, and an amended PSR was also filed for Perez, updating the recommended Sentencing Guidelines calculations in response to some of the government's objections. The district court conducted separate sentencing hearings for each Appellant. All four Appellants were given life sentences; Vladimir is the only Appellant who does not challenge the court's sentencing determination.

The court's calculation of offense levels for Hernandez and Leonidas relied upon the quantity of drugs it determined were reasonably foreseeable under U.S.S.G. § 2D1.1 (2014) (the version of the Guidelines relevant to all determinations in this case and cited throughout this opinion). Though they had separate hearings, there was much overlap in the evidence against them, given their identical charges of conviction and track record of working together. The court used a "multiplier method" to arrive at the conclusion that both Appellants were responsible for distributing at least 25.2 kilograms of crack cocaine, which mandated a base offense level of 38. From there, the district court applied various sentencing enhancements to one or both Appellants, including enhancements for possession of firearms, use of

threats, obstruction of justice, and managerial role in the enterprise.  Hernandez was calculated to have a final offense level of 45, which is above the cutoff for a recommendation of a life sentence regardless of criminal history.  Leonidas's final offense level was 42 which, coupled with a criminal history category of IV, resulted in a recommended sentencing range of 360 months to life.  The court considered the 18 U.S.C. § 3553(a) factors, particularly focusing upon the need for public safety and deterrence, in determining that a life sentence was appropriate for each of them.

Like his co-Appellants, Perez was sentenced to life. Given our disposition as to Perez, we do not reach his sentencing challenges.

## II

We first evaluate each of Appellants' merits claims, beginning with Hernandez and Leonidas's joint attempt to access a sealed filing post-verdict, proceeding to examine the same Appellants' challenge to certain police officer testimony and Perez's extraterritoriality claim, and finishing with consideration of all four Appellants' sufficiency-of-the-evidence arguments.

## A

Leonidas and Hernandez claim the district court erred in blocking their counsel from viewing a post-verdict filing made in camera by a third party.  They speculate that the filing contains "information that could have been used to impeach . . . Guillen."  We review for abuse of discretion a district court's denial of a motion to unseal, *see United States*

*v. Sleugh*, 896 F.3d 1007, 1012 (9th Cir. 2018),[2] reversing only if the denial was "illogical, implausible, or without support in inferences that may be drawn from the facts in the record," *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc).

We have examined the third-party filing at issue and determined that the district court acted well within its sound discretion in declining to allow Leonidas's and Hernandez's attorneys to view it. Because of the salacious nature of the content, we do not detail the facts here. But we have carefully considered the material and the arguments of defense counsel, and hold that the suppressed evidence does not contain *Brady* material.

B

Leonidas and Hernandez next assign as error the district court's admission of large portions of testimony from four law-enforcement witnesses. Appellants claim the government surreptitiously elicited expert testimony from the officers—who were testifying as lay witnesses, not experts—in violation of Rule 701 of the Federal Rules of Evidence. We review a district court's evidentiary rulings for abuse of discretion "and uphold them unless they are illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *United States v. Gadson*, 763 F.3d 1189, 1199 (9th Cir. 2014) (internal citation omitted). And the plain-error standard governs a witness's opinion not objected to at trial, *see id.* at 1209: we

---

[2] The appellant in *Sleugh* sought the unsealing of the Rule 17(c) applications of his co-defendant-turned-government-cooperator. 896 F.3d at 1011. While those circumstances differ from these—the appellants here seek mere in camera review—*Sleugh*'s logic applies here, as does its standard of review.

decline to reverse based on an erroneous evidentiary ruling unless the district court's refusal to intervene sua sponte is "(1) error; (2) that is plain; (3) that affects substantial rights; and (4) . . . seriously affects the fairness, integrity, or public reputation of judicial proceedings," *United States v. Pelisamen*, 641 F.3d 399, 404 (9th Cir. 2011) (citing *Johnson v. United States*, 520 U.S. 461, 466–67 (1997)). Any error in admitting a lay witness's opinion is harmless so long as "in light of the evidence as a whole, there was a 'fair assurance that the jury was not substantially swayed by the error.'" *Gadson*, 763 F.3d at 1208 (quoting *United States v. Freeman*, 498 F.3d 893, 905 (9th Cir. 2007)).

1

The government called officers Joe Guadian, Paul Keenan, Manuel Rodriguez, and Daniel Jenks as witnesses during its case-in-chief. At the times relevant to their testimony, Guadian was a federal Bureau of Prisons (BOP) investigator, Keenan and Rodriguez were FBI Special Agents, and Jenks was an LAPD detective; Keenan was the lead case agent for the prosecution. The four officers opined on a variety of subjects. Appellants claim that some of this testimony, including their opinions on "code words, phone calls, graffiti, and tattoos," was not permissible lay-opinion testimony.

Rule 701 of the Federal Rules of Evidence "allows a lay witness to offer opinions that are (a) 'rationally based on the witness's perception,' (b) 'helpful' to the jury, and (c) 'not based on scientific, technical, or other specialized knowledge within the scope of' expert testimony." *Gadson*, 763 F.3d at 1206 (quoting Fed. R. Evid. 701). This rule applies with equal force to a law-enforcement witness: a police officer may have knowledge derived specifically from an investigation, and he may offer opinions based on that

knowledge, but his employment does not endow him with any freestanding license to offer opinions.  For instance, he may offer interpretations of "ambiguous conversations based upon his direct knowledge of the investigation," *Freeman*, 498 F.3d at 904, or translate the drug jargon used by the targets of his investigation, *see United States v. Reed*, 575 F.3d 900, 923 (9th Cir. 2009).  But he *may not* "testify based on speculation, rely on hearsay or interpret unambiguous, clear statements."  *United States v. Lloyd*, 807 F.3d 1128, 1154 (9th Cir. 2015) (internal citation omitted) (prejudicial error to admit statement that "[e]verybody that [the witness had] ever worked with will always stretch the truth and make . . . outright lies especially in certain techniques").  Guided by these principles from our case law, we evaluate each officer's testimony in turn.

*Prison Investigator Joe Guadian*

Guadian testified on the fourth and fifth days of trial, offering background on the Eme before analyzing the tattoos, associations, visitations, funds deposits, and communications of Eme members incarcerated at Florence, particularly Martinez.  Guadian expressly based his testimony on information gleaned from his investigation of the Eme, his personal observations of Martinez, and his interaction with other Eme inmates.  Leonidas and Hernandez posit that much of Guadian's testimony was "classic expert testimony," but they did not so object at trial; their few objections did not serve to bring the competency issue to the trial court's attention.[3]  Review is thus for plain error.  *See Gadson*, 763 F.3d at 1209.

---

[3] A defendant who fails to object to lay-opinion testimony under Rule 701 may nevertheless preserve his objection—and trigger abuse-

Leonidas and Hernandez assert that, because the sort of testimony offered by Guadian has been elicited from expert witnesses in other cases, it cannot be lay-opinion testimony here. But whether evidence is more properly offered by an expert or a lay witness "depends on the basis of the opinion, not its subject matter." *United States v. Barragan*, 871 F.3d 689, 704 (9th Cir. 2017). The basis of Guadian's opinions—his prolonged and searching scrutiny of the subject enterprise—entitled him to opine on most of the subjects of his testimony. *See Freeman*, 498 F.3d at 902 (an officer may "interpret ambiguous statements based on his general knowledge of the investigation"). Guadian knew about the money Martinez received in his inmate account, for example, because he tracked the account. And he drew on years of investigating CLCS and the Eme in interpreting ambiguous terms in Martinez's letters—jargon like "rent" and code phrases like "higher court judge."

While some of Guadian's opinions—such as his foray into the Eme's Mayan roots—arguably transgressed Rule 701's restrictions, we cannot say that any error meets our plain-error standard. That is, even if the district court should not have admitted isolated aspects of Guadian's testimony, its error in declining to intervene sua sponte was not "plain," did not "affect[] substantial rights," and did not "seriously affect[] the fairness, integrity, or public reputation" of the trial. *Pelisamen*, 641 F.3d at 404 (internal citation omitted). Asked repeatedly at oral argument about what prejudice Leonidas and Hernandez suffered because of the admission of Guadian's opinions on the history of the Eme and its

---

of-discretion review on appeal—if he objects to "hearsay, speculation, and lack of foundation," which serves to "raise the essence of these concerns." *Freeman*, 498 F.3d at 904. No such objections were made here.

Mayan roots, counsel was unable to point to a single concrete connection between the offending opinions and Appellants' convictions. *See, e.g.*, Tr. of Oral Arg. at 5:36–5:59; 8:01–8:07; 15:22–16:24.

Counsel's inability to point to any actual prejudice from the district court's admission of Guadian's opinions reinforces what is obvious: allowing Guadian to testify as he did was not plain error.

*Special Agent Paul Keenan*

Special Agent Keenan, the FBI's lead case agent, testified on the trial's tenth and eleventh days. Appellants repeatedly objected to the relevance and foundation of Keenan's testimony; review is thus for abuse of discretion. *See Freeman*, 498 F.3d at 904.

Keenan testified about activities he observed and conducted during the investigation he led into CLCS, including surveillance of members' meetings and drug distribution efforts; wiretaps of their phones; controlled purchases from gang members; and the results of searches of CLCS-affiliated properties. He matched gang members to monikers and vice versa, translated gang jargon, and identified indicia of drug trafficking, such as small plastic bags and digital scales. None of this testimony was impermissible under Rule 701. Keenan directly observed the communications, meetings, and searches he described. And while his comprehension of jargon and knowledge of drug trafficking would be suitable subjects for expert testimony, his investigation into CLCS was a proper basis for offering his lay opinions on these subjects. *See Gadson*, 763 F.3d at 1209. The district court did not abuse its discretion in allowing Keenan's testimony.

*Special Agent Manuel Rodriguez*

FBI Special Agent Rodriguez testified on the eleventh day of trial. We review the district court's admission of Rodriguez's testimony for abuse of discretion; Appellants' foundation objection served to raise their concerns to the district court. *See Freeman*, 498 F.3d at 904.

Rodriguez's testimony mirrored that of Keenan: he identified callers on wiretaps by their voices, detailed FBI surveillance of the CLCS figures at issue, and matched gang members to their monikers and vice versa. He offered a few specific opinions that implicate Rule 701: Rodriguez interpreted graffiti and opined that when Pantoja asked Guillen if Pantoja could "take [his] boy to practice tomorrow," he was really asking if he could deliver drug proceeds to Guillen**.**

Rodriguez's interpretation of the wiretapped conversation between Pantoja and Guillen is just the kind of "ambiguous conversation[]" a lay witness with direct knowledge of an investigation—and, in this case, long hours spent listening to wiretaps and observing meetings—can clarify for the jury under *Freeman*. 498 F.3d at 904. The translation of Pantoja's coded language required no technical or specialized knowledge, *see* Fed. R. Evid. 702— just familiarity with the subjects. Nor was it paraphrasing "unambiguous, clear statements." *Lloyd*, 807 F.3d at 1154. *See also Gadson*, 763 F.3d at 1231 (Berzon, J., concurring in part and dissenting in part). Likewise, telling the jury that he thought the graffiti letters "XVIII" stood for "18" required no hidden calculus or reliance on hearsay, as Appellants allege.

Even if the district court abused its discretion in allowing Rodriguez's testimony, we are convinced the error was

harmless.  Most of Rodriguez's testimony—like that of the other officers—simply provided the jury with informative but only tangentially relevant information about CLCS's overall activities and the means by which the police investigated them.  We cannot imagine that the jury's hearing that "XVIII" meant "18," for example, had any discernible effect on their verdict as to whether Appellants conspired to distribute narcotics.  We have no difficulty in rejecting Appellants' challenge to Rodriguez's testimony.

### Detective Daniel Jenks

Finally, LAPD Detective Jenks testified on the twenty-fourth trial day.  Jenks summarized the content of (1) wiretapped calls made by Murillo, including translations of gang slang, (2) jail phone calls made to Perez, and (3) searches, interviews, and arrests conducted after baby Garcia's murder.  Leonidas and Hernandez challenge Jenks's opinions on the Murillo and Perez calls as improper under Rule 701.  But Leonidas and Hernandez said nothing at trial about the Perez calls; it was *Perez's* counsel who objected to their introduction, and only *after* Jenks offered his opinion on the contents of the Murillo calls.  The district court therefore lacked timely notice of Appellants' objection to Jenks's opinions on the Murillo calls—which Leonidas and Hernandez now press on appeal—until after Jenks had finished opining on them.  The Perez calls have nothing to do with Leonidas and Hernandez.  Allowing Jenks to offer his opinion on them did not affect Leonidas and Hernandez in any way.  That leaves the Murillo calls.  Because there was no relevant objection until after Jenks had already opined on their meaning, we evaluate whether the court's failure to intervene sua sponte to prevent the testimony was plain error.

In a few places, Jenks's testimony approached the line of permissibility under Rule 701.  For instance, the jury was played a recording of a conversation between Murillo and a friend, in which Murillo, describing the requirement that those who sold drugs in CLCS territory pay rent, told the friend, "['C]ause I mean ain't . . . nobody doing no dope slanging for free, dog.  I don't care who."  Jenks told the jury this meant "that nobody gets to sell for free; they're going to have to pay, basically, a tax or a fee to sell narcotics."  This approaches the line Judge Berzon warned about in her partial concurrence in *Gadson*:  rather than translating slang or ambiguous conversations, Jenks simply paraphrased Murillo's words in a way that made their incriminating nature clearer.  *See* 763 F.3d at 1231 (Berzon, J., concurring in part and dissenting in part).

But even if Leonidas and Hernandez might properly have objected to the admission of Jenks's opinions at trial, this is plain-error review—and they come nowhere close to alleging plain error.  The line between lay and expert testimony in this context, we have acknowledged, "is a fine one."  *Freeman*, 498 F.3d at 904.  Even granting, for sake of argument, that any error in admitting Jenks's opinions should have been plain to the district court, Leonidas and Hernandez cannot show that allowing the jury to hear those opinions affected their substantial rights or the fairness of the proceedings.  A thorough examination of the transcripts of Murillo's phone conversations reveals they do not so much as mention any Appellant's name or moniker, nor do they pertain in any way to Leonidas's or Hernandez's roles in CLCS.  There was no plain error in allowing this testimony.

2

Appellants concede that other lay witnesses—former CLCS members—properly corroborated nearly all the

officers' challenged testimony,[4] but argue that those witnesses—Pantoja, Delaguila, Alexander Serrano, Villalobos, and Guillen—were "inherently suspect because they were testifying in exchange for sentence reductions." But Appellants' counsel deftly elicited the cooperators' incentive to deceive on cross-examination; the jury was well aware of the sentence reductions each was in line to receive, and it chose to credit their testimony anyway. There is no rule in our Circuit that a criminal conviction may not, as a matter of law, rest on the testimony of government cooperators. In our system, "[i]t is up to the jury . . . to determine the credibility of a witness' testimony." *United States v. Weatherspoon*, 410 F.3d 1142, 1147 (9th Cir. 2005). We decline Appellants' invitation to intrude on the province of the jury.

And Appellants ignore the import of the agents' testimony, which was not primarily to implicate Appellants in illicit activity, but rather to prove the existence of a criminal enterprise, which conducted its business through a pattern of racketeering activity, including a conspiracy to distribute narcotics. Dozens of other witnesses—lay and expert, law enforcement and gang member—established

---

[4] For example, Pantoja corroborated Guadian's testimony as to the meanings of 18th Street and Eme tattoos. Guillen deposited the money in question in Martinez's account and attested to that fact and others regarding the inmate-funds system. Guillen also authenticated and provided firsthand testimony about several of the letters Guadian identified. Several witnesses corroborated Guadian's testimony regarding the Eme's structure and authority. Keenan's moniker opinions were echoed by nearly everyone who took the stand, and while his description of searches was novel, testimony about what those searches uncovered—namely, narcotics—pervaded the trial. Jenks's testimony relating to Murillo's calls—which did not so much as mention Hernandez or Leonidas—was confirmed by numerous witnesses who testified about CLCS's drug dealing and gangbanging activities.

CLCS's narcotics and racketeering endeavors. Given "the overwhelming evidence" that the enterprise and conspiracy existed based on other witnesses' testimony, *Lloyd*, 807 F.3d at 1168, we have more than "a fair assurance that the jury was not substantially swayed by the error," *Gadson*, 763 F.3d at 1208 (internal quotation marks and citation omitted).

The district court diligently patrolled the line between lay and expert testimony. In those few instances in which admission of these four witnesses' testimony was error, Appellants suffered no prejudice. We decline to disturb Appellants' convictions on this basis.

### C

Perez challenges his convictions on four counts, alleging the district court improperly instructed the jury on the extraterritorial application of the VICAR statute at issue. We review de novo both a district court's determination of a statute's extraterritorial reach, *see United States v. Ubaldo*, 859 F.3d 690, 699 (9th Cir. 2017), and jury instructions "challenged as misstatements of law," *United States v. Kleinman*, 880 F.3d 1020, 1031 (9th Cir. 2017) (internal citation omitted).

### 1

Federal statutes are presumed to apply only within American territorial jurisdiction. *See Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285 (1949). The so-called presumption against extraterritoriality has both descriptive and normative justifications: it is based in part on "the commonsense notion that Congress generally legislates with domestic concerns in mind," *Smith v. United States*, 507 U.S. 197, 204 n.5 (1993), and it serves to prevent "unintended

clashes between our laws and those of other nations which could result in international discord," *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991). Unless a statute gives "a clear, affirmative indication that it applies extraterritorially," it covers only domestic conduct. *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2101 (2016).

*RJR Nabisco* lays out a two-step process for determining whether a statute has extraterritorial effect. First, we ask "whether the presumption against extraterritoriality has been rebutted." *Id.* The presumption "can be rebutted only if the text provides a 'clear indication of an extraterritorial application.'" *WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129, 2136 (2018) (quoting *Morrison v. Nat'l Australia Bank, Ltd.*, 561 U.S. 247, 255 (2010)). Second, if the statute does not apply extraterritorially, we ask "whether the case involves a domestic application of the statute"; that is, whether "the conduct relevant to the statute's focus occurred in the United States." *RJR Nabisco*, 136 S. Ct. at 2101.[5]

---

[5] Early in this doctrine's development, the Supreme Court suggested that the presumption should not apply equally to "criminal statutes which are, as a class, not logically dependent on their locality for the government's jurisdiction." *United States v. Bowman*, 260 U.S. 94, 98 (1922). We have applied the presumption to criminal statutes, albeit without mentioning *Bowman*. *See Ubaldo*, 859 F.3d at 700. And most courts of appeals applying *Bowman* still require the government to show that the presumption against extraterritoriality has clearly been rebutted by the text of the statute. *See, e.g.*, *United States v. Garcia Soto*, 948 F.3d 356, 360 (D.C. Cir. 2020); *United States v. Hoskins*, 902 F.3d 69, 96 (2d Cir. 2018); *United States v. Vasquez*, 899 F.3d 363, 373 n.6 (5th Cir. 2018). *But see United States v. Leija-Sanchez*, 602 F.3d 797, 798 (7th Cir. 2010) (applying *Bowman* to hold VICAR applies extraterritorially without relying on the text of VICAR to rebut the presumption). Because we hold that the question of VICAR's

2

Perez finds fault in the district court's instruction to the jury on Counts One, Sixteen, Seventeen, and Eighteen of the indictment. Count One charged a RICO conspiracy, while the other three charged VICAR counts: Count Sixteen charged conspiracy to murder, Seventeen charged conspiracy to kidnap,[6] and Eighteen alleged attempted murder, all under VICAR's umbrella.[7] In instruction 52, the district court told the jury, "The RICO and VICAR statutes apply extraterritorially. It therefore is not necessary for the government to prove, with respect to Counts One . . . Sixteen, Seventeen, [and] Eighteen . . . that any part of the charged crime took place within the United States."

That instruction is wrong.[8] *RJR Nabisco* explicitly held that RICO, 18 U.S.C. § 1962—the statute charged in Count

---

extraterritorial reach is controlled by *RJR Nabisco*, we do not grapple with *Bowman*.

[6] Perez does not challenge his conviction on Count Seventeen because the jury found, with respect to Count Twenty's conspiracy-to-kidnap charge, that both the conspiracy's origin and an overt act in furtherance of the conspiracy took place in the United States. *See* Tr. of Oral Arg. at 23:40.

[7] Six California Penal Code sections formed the basis of Perez's VICAR convictions: Cal. Penal Code §§ 21(a), 31, 182, 187, 189, and 664. At the time of trial, § 21(a) defined attempt; § 31 outlined accomplice liability; § 182 detailed conspiracy; § 187 defined murder; § 189 separated first- and second-degree murder; and § 664 laid out punishments for inchoate offenses.

[8] Whether it was wrong when the district court gave it in 2012 is another question. During the time between final judgment and submission after oral argument on appeal, the law of extraterritoriality changed at least twice in our Circuit. *See United States v. Chao Fan Xu*,

One—may have extraterritorial effect, "but only to the extent that the predicates alleged in a particular case themselves apply extraterritorially." 136 S. Ct. at 2102. And there is an evident analogy between RICO and VICAR, the basis of Perez's convictions on Counts Sixteen and Eighteen. VICAR incorporates RICO's definition of "racketeering activity," *see* 18 U.S.C. § 1959(b)(1), and it, too, brings under its umbrella some wholly extraterritorial acts, such as the federal prohibition on a United States national killing another United States national abroad, *see id.* § 1959(a)(1); *id.* § 1119(b). In light of this authority, then, VICAR at least *may* reach a crime committed abroad with sufficient nexus to the conduct of an enterprise's affairs.

But VICAR does not reach all crimes committed in other countries. If the laws of the United States or the States cannot reach foreign conduct, neither may VICAR. And the predicate crimes with which Perez was charged—California's attempted murder statute and its definitional components—do not proscribe wholly extraterritorial acts. California's jurisdictional statutes and case law explicitly rule out punishing an act committed entirely in another country: California may exercise its "territorial jurisdiction over an offense if the defendant, [1] with the requisite intent, [2] does a preparatory act in California that is more than a de minimis act toward the eventual completion of the offense." *People v. Betts*, 103 P.3d 883, 887 (Cal. 2005). *See also* Cal. Penal Code § 778a(a).

---

706 F.3d 965 (9th Cir. 2013) (RICO does not apply extraterritorially), *abrogated by RJR Nabisco*, 136 S. Ct. at 2102 (RICO reaches foreign conduct to the extent its predicates do). The district judge here did an exceptional job handling this complex case involving multiple defendants and multiple counts that would have posed a challenge to even the most conscientious jurist.

It may well be that California *could* exercise its jurisdiction over the conduct charged here: even though the California murder statute does not cover wholly extraterritorial conduct, the government presented substantial evidence that Perez joined an existing conspiracy to murder Macedo formulated in the United States, and that his conduct thus came within the statute's domestic "focus." *See RJR Nabisco*, 136 S. Ct. at 2101; Cal. Penal Code § 778a(b) (allowing criminal sanction for a person who "within this state, kidnaps another person . . . and thereafter carries the person into another state or country and commits any crime of violence or theft against that person"). *See also People v. Brown*, 109 Cal. Rptr. 2d 879, 881–83 (Cal. Ct. App. 2001) (California had jurisdiction to prosecute a doctor who caused victim's death through botched amputation performed in Mexico—but who picked the victim up and received payment in California). The government presses this point on appeal, arguing that "conduct relevant to the statute's focus clearly occurred in the United States." But the jury deciding Perez's guilt was instructed that it could convict Perez without finding *any* of his conduct occurred in the United States. Because California requires the formulation of criminal intent—and a non-de-minimis act in furtherance of the crime's commission—in California, the district court's instruction was in error.

3

Even though the extraterritoriality instruction to the jury misstated the law, "[a]n improper jury instruction does not require reversal if the error is harmless." *United States v. Garcia*, 729 F.3d 1171, 1177 (9th Cir. 2013). *See also Chapman v. California*, 386 U.S. 18, 24 (1967). A "constitutional" error is only harmless if we are satisfied "beyond a reasonable doubt that the . . . instruction . . . did

not contribute to the guilty verdict." *Kleinman*, 880 F.3d at 1035. Whether a jury-instruction error is constitutional is sometimes "not clear." *United States v. Hernandez*, 476 F.3d 791, 801 (9th Cir. 2007). Where that error lies in *defining the offense*, we have required harmlessness to be proven beyond a reasonable doubt. *See, e.g.*, *Neder v. United States*, 527 U.S. 1, 19–20 (1999) (error subject to harmless-error review where the instruction omitted an element of the offense); *Garcia*, 729 F.3d at 1177–78 (erroneous definition of manslaughter was constitutional error). While the district court's misstatement of 18 U.S.C. § 1959's geographic reach was not the omission of an element (like the errors in *Neder* and *Garcia*), it was tantamount to such an error.

That error incorrectly described the district court's authority to hail Perez before the court and to punish him for conduct occurring outside its physical jurisdiction. Like the statutory elements in *Neder* and *Garcia*, a nexus between American territory and Perez's participation in the crimes alleged is a necessary condition for his conviction where, as here, the statute does not reach Perez's purely extraterritorial criminal conduct. As a result of the error, the jury was wrongly told it could find him guilty for crimes occurring solely in Mexico. We think this error has a constitutional due process dimension: it relieved the United States of the burden of proving the required connection between American territorial jurisdiction and the crimes in Counts One, Sixteen, Seventeen, and Eighteen for which Perez stood trial in the Central District of California. *See United States v. Davis*, 905 F.2d 245, 248–49 (9th Cir. 1990) (framing extraterritorial application of a statute in due process terms); *cf. In re Winship*, 397 U.S. 358 (1970) (proof of a criminal charge beyond a reasonable doubt required by due process). We therefore evaluate whether the

instructional error as to those Counts was harmless beyond a reasonable doubt.

We see three considerations to weigh in our harmlessness calculus: (1) the weight of the evidence establishing the conspiracy's beginning in this country; (2) the jury's special finding regarding the date on which the conspiracy began; and (3) the court's instruction on Count Sixteen, wherein the jury heard that to convict Perez of conspiracy to murder, it must find that "an overt act was committed *in this state*." On the basis of all three factors combined, we find the instructional error harmless as to Count Sixteen, but reverse as to Count Eighteen where no contrary instruction cured the initial error.

i

Our harmless-error standard emphasizes that where evidence of a defendant's guilt is "overwhelming," even significant jury-instruction error can be harmless. *See, e.g.*, *United States v. Conti*, 804 F.3d 977, 981 (9th Cir. 2015). However, failing to instruct on an element of a crime is not harmless if there is sufficient evidence that the jury could have found in favor of the defendant if properly instructed. *Neder*, 527 U.S. at 19.

At trial, the government presented compelling evidence that the conspiracy to murder Macedo began in California shortly after Garcia's death. The jury heard testimony that the Eme-mandated "green light"—the authorization for all Southern California Hispanic gangs to punish CLCS for baby Garcia's murder—was "automatic" as soon as the infant died. Isaac Guillen told the jury that a gang that fails to "clean [its] own house" by taking out the murderer of a child starts "getting hit" by other gang members in lockup,

and that other Eme members would expect Martinez to green-light CLCS members if they had killed an infant.

Pantoja's testimony was key. He was repeatedly pressed about the origins of the conspiracy to murder Macedo, testifying that if Macedo was left alive, all of CLCS would come under sustained attack from other gangs. He told the jury his plan was to kill Macedo all along, that Macedo's death was necessary to spare CLCS, and that he started preparing immediately to kill Macedo. The jury was entitled to credit Pantoja's testimony: the evidence was sufficient to support Perez's convictions. *See* Part II.D.2, *infra*.

But *sufficient* is not *overwhelming*. As Perez points out, Pantoja gave shifting and contradictory explanations for bringing $30,000 to Mexico, ultimately telling the jury he did not know why he brought the money along. (Perez claims the $30,000 was to pay to board Macedo in Mexico—money that would be unnecessary if the plan were to kill Macedo the whole time.) Perez also elicited from Pantoja that, despite the latter's earlier testimony that *everyone* knew a green light automatically attached to the murderer of a child, Macedo himself was apparently completely in the dark about the ramifications of having killed Garcia.

These inconsistencies bolster the defense theory of the case: that Pantoja planned to hide Macedo out in Mexico—and brought money to board him there—but ultimately changed his mind *in Mexico* and ordered Macedo's death. And Perez made his case plain by hammering Pantoja's trial statements' inconsistency with Pantoja's previous proffers, in which Pantoja had told the government he ordered Macedo taken to Mexico to hide him out, not to kill him. Our precedents establish a high bar for finding harmlessness beyond a reasonable doubt. *See, e.g.*, *Neder*, 527 U.S. at 19 (error not harmless where defendant "contested the omitted

element and *raised evidence sufficient to support a contrary finding*" (emphasis added)). Pantoja was the government's key witness as to the conspiracy's origins. His credibility problem and conflicting accounts of the plan to kill Macedo would have given the jury ample ground "to support a contrary finding." *Id.* Thus, while the weight of the evidence cuts in favor of harmlessness, we do not find that the evidence alone is a sufficient basis for finding the jury-instruction error harmless.

ii

In finding Perez guilty of Count One, the jury made a special finding that the conspiracy to murder Macedo began "on or about September 15, 2007"—the date of baby Garcia's murder—and continued through "on or about September 21, 2007"—the day Perez and Murillo tried to kill Macedo. Murillo picked up Macedo in the Los Angeles area to take him to Mexico late at night on September 19, and they arrived in Tijuana, Mexico, early in the morning on September 20—four days after Garcia's murder and just a day before the attempted murder of Macedo.

That the jury found the conspiracy began "on or about September 15" is strong evidence it believed the government's case that the plan was hatched in the Central District of California. It would be strange indeed for a juror who believed Perez's theory of the case to sign off on this finding despite believing it set the conspiracy's beginning five days too early—on a six-day timeline. But, as one of the district court's earlier instructions clarifies, "on or about" is flexible: the court told the jury it need only find the crime was committed "on a date *reasonably near* the date alleged in the indictment," not "precisely on the date charged." Our case law holds that *eighteen days* is "reasonably near" the date alleged, *see United States v. Hinton*, 222 F.3d 664, 672–

73 (9th Cir. 2000), though two years is not, *United States v. Tsinhnahijinnie*, 112 F.3d 988, 991–92 (9th Cir. 1997). With this background in mind, we cannot say we are convinced beyond a reasonable doubt that every juror who agreed the conspiracy began "on or about September 15" definitively ruled out that it began on September 20.

iii

The final piece of this harmlessness puzzle is the most important:  in its specific instruction regarding Count Sixteen—the VICAR conspiracy to murder—the district court told the jury that, in order to convict, it must find, among other elements, that "an overt act was committed *in this state* by one or more of the persons" involved.  The jury was thus correctly apprised of the facts necessary to trigger California's jurisdiction over the crime. *See Betts*, 103 P.3d at 887.  Because it came immediately after the incorrect instruction and more specifically addressed the jurisdictional question, jurors deciding Perez's guilt on that count could be left with little doubt that they could not convict Perez solely on the basis of his conduct in Mexico.  Together with the evidence of the conspiracy's origin in California, and the jury's special finding on Count One, the correct instruction on Count Sixteen convinces us that the district court's jury-instruction error was harmless as to that count, and Perez's conviction for VICAR conspiracy to murder should therefore stand.[9]

---

[9] Because we hold with regard to Count Sixteen—and Perez concedes as to Counts Seventeen and Twenty—that his convictions were properly based on territorial conduct, we also affirm his conviction on Count One, RICO conspiracy. 18 U.S.C. § 1962(d) does not *require* that each conspirator commit two independent predicate offenses. *See Salinas v. United States*, 522 U.S. 52, 65–66 (1997).  But a conspirator's

The same cannot be said for Perez's conviction on Count Eighteen, VICAR attempted murder. No correct instruction cured the earlier, wrongful instruction. Indeed, the presence of the territorial requirement in Count Sixteen's instruction may have served only to draw the jury's attention to the *lack* of such a domestic requirement on Count Eighteen. Because the weight of the evidence and the special finding alone do not eliminate all reasonable doubt about what the jury determined about the location of the conspiracy's origin, we reverse Perez's conviction on Count Eighteen. The government may elect to retry Perez on that count following remand, or, if the government decides not to retry him, the district court can simply resentence Perez without Count Eighteen.

## D

Finally, all four Appellants challenge the sufficiency of the evidence underlying their convictions. We review the denial of a defendant's motion to acquit de novo. *See United States v. Christensen*, 828 F.3d 763, 780 (9th Cir. 2015). The evidence underlying a conviction is sufficient if, "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Phillips*, 929 F.3d 1120, 1123 (9th Cir. 2019) (internal citation omitted). *See also Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

---

individually committing multiple predicate offenses is certainly *sufficient* to support a RICO conspiracy conviction where, as here, the other statutory requirements are met.

1

Hernandez and both Iraheta brothers challenge the sufficiency of the evidence underlying their convictions on Count Two, narcotics conspiracy.  All three moved for acquittal after the verdict was returned.  To convict these Appellants for narcotics conspiracy, the government was required to show:  (1) there existed an agreement between two or more persons to possess with intent to distribute or to distribute crack cocaine or methamphetamine or both; and (2) Appellants joined the agreement knowing of its purpose and intending to help accomplish that purpose.  Little need be said regarding the existence of an agreement to distribute drugs:  the evidence showed drug distribution was the cornerstone of CLCS's enterprise, its raison d'etre.  Nearly every witness who took the stand testified to some aspect of CLCS's pervasive regime of crack dealing.  The evidence of its existence was truly overwhelming.

So too was the evidence of Hernandez's central role in the charged conspiracy.  Multiple witnesses referred to Hernandez as a "shot caller" or leader of CLCS's drug-trafficking operation.  Alexander Serrano, who was the lead rent collector at Eighth and Burlington, testified that Hernandez "was the one in charge of [Westlake Avenue] collecting rent" in 2000; Villalobos and Delaguila said the same.  Villalobos's testimony was particularly informative:

> PROSECUTOR: Okay. What role did Defendant Hernandez have at Westlake?
>
> VILLALOBOS: [Hernandez] had ultimate control of who was going to sell—what material is going to be on the street; what Mayorista he wants there—all—controlled all the narcotics on the streets . . .

Westlake was regarded as one of the crown jewels of CLCS's narcotics operation:   Pantoja testified that Hernandez collected between $5,000 and $8,000 per week in rent from the street's traqueteros and mayoristas, and that it was Hernandez's idea to begin taxing vendors like Clemente.  Guillen testified that Hernandez was part of Martinez's "legal team"—the "top echelon" of his trusted lieutenants, and that Hernandez was charged with delivering the proceeds from CLCS's narcotics sales to Guillen when Pantoja was unavailable. There is more, but it is clear that, viewing this evidence in the light most favorable to the prosecution, a reasonable trier of fact could convict Hernandez for his participation in the narcotics conspiracy.

Likewise, Vladimir Iraheta's participation in CLCS's narcotics operation cannot seriously be questioned. Vladimir concedes that "he has been a gang affiliate" with "a history of prior arrests for narcotics related conduct."  But he claims there was "scant evidence concerning the activities of or any acts actually performed by" him.  He blames "an inflamed jury" for convicting him on the narcotics conspiracy because of the evidence of murder presented against him.

At trial, the government put on copious evidence that Vladimir played an integral role in CLCS's drug-trafficking operation.  Like Hernandez, Vladimir was held to be among Martinez's "legal team"—his trusted lieutenants in CLCS territory.  Serrano characterized Vladimir as Hernandez's "muscle."   Villalobos told the jury Vladimir became Hernandez's deputy overseeing fifteen to twenty traqueteros on Westlake Avenue around 2001 or 2002, and that Villalobos gave money collected from traqueteros to Vladimir to bring to Guillen.  Vladimir protests that his mere association with CLCS is not enough to convict him for

participating in the narcotics conspiracy. He's right: "mere gang membership" is not enough to show that a person has joined a criminal conspiracy. *See United States v. Bingham*, 653 F.3d 983, 997 (9th Cir. 2011). Not every CLCS member is guilty of taking part in a narcotics conspiracy by virtue of his gang allegiance. Unfortunately for Vladimir, the evidence shows far more than "mere gang membership," or mere presence in CLCS territory. The government put on evidence sufficient for rational jurors to find Vladimir was a core member of CLCS's drug-trafficking operation. He enriched it by supervising drug sales, he protected it with violence, and he helped launder its profits.

Vladimir complains that the government's narcotics-conspiracy case against him largely rested on Villalobos's testimony. Vladimir's argument goes like this: because Villalobos was the chief witness in the government's murder case against him, and because the jury hung on that count, the jury necessarily disbelieved Villalobos, so his testimony linking Vladimir to the narcotics conspiracy cannot be credited. Putting aside that Villalobos was far from the only witness who implicated Vladimir in CLCS's narcotics activity, the district court was right when, in denying Vladimir's motion to acquit, it said, "[T]he jury can believe Mr. Villalobos on one issue but not other issues." Indeed, the jury's willingness to credit *parts* of Villalobos's testimony while disregarding others showcases its thoughtful, discerning approach to the case; there is no evidence the jury was "inflamed" against Vladimir. It was entitled to find him guilty based on the evidence established at trial. Vladimir's narcotics-conspiracy conviction is affirmed.

Leonidas Iraheta's sufficiency claim fails, too. Witness after witness identified Leonidas as a core member of

CLCS—one who sold drugs, protected CLCS territory with violence, and helped to run its business operations. Like his brother, Leonidas was considered part of Martinez's "legal team." Pantoja testified that, in 2000, Leonidas assisted Hernandez in collecting rent from one of CLCS's Westlake crack-dealing locations, and that Leonidas accompanied him on missions to intimidate the rival Rockwood gang. Crucially, Pantoja also testified that he personally witnessed Leonidas selling crack and meth in CLCS territory. Villalobos told the jury that Leonidas distributed drugs on Westlake Avenue. Delaguila corroborated Pantoja's testimony that Leonidas collected rent from drug sales. As with his co-defendants, the evidence that Leonidas willingly joined and helped further the purpose of CLCS's narcotics machine is overwhelming. His conviction on this count is affirmed.

2

Perez challenges the sufficiency of the evidence giving rise to his three conspiracy convictions: Counts Sixteen (VICAR conspiracy to murder), Seventeen (VICAR conspiracy to kidnap), and Twenty (garden-variety conspiracy to kidnap, 18 U.S.C. § 1201(a)(1), (c)). The first basis of his challenge is the supposed unreliability of Pantoja's testimony.[10] Having addressed that contention and found it wanting, *see* Part II.C.3.i, *supra*, we will not belabor it any further. As with the sufficiency of the evidence underlying the other Appellants' convictions, we review de novo the district court's denial of Perez's motion to acquit,

---

[10] The government characterized Perez's claim that Pantoja perjured himself as a due-process challenge under *Napue v. Illinois*, 360 U.S. 264 (1959), and its progeny. Perez expressly disavows a *Napue* claim, so we need not address it.

affirming the conviction if, "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Phillips*, 929 F.3d at 1123.

In addition to his attack on Pantoja's credibility, Perez argues that, even if there was sufficient evidence of the conspiracy's originating in the United States, there was insufficient evidence that he joined that conspiracy in this country.[11] Perez does not deny his presence at the Mexicali cliffside, nor that he tried to murder Macedo there. But he denies that a reasonable jury could have found that he joined the conspiracy *in California*.

The evidence of Perez's joining the conspiracy in California is admittedly less than overwhelming. But examining that evidence in the light most favorable to the government, it was sufficient to permit a reasonable jury to find beyond a reasonable doubt that Perez joined the conspiracy in California. Pantoja told jurors emphatically and repeatedly that the conspiracy began in California: he told them he ordered Murillo to take Macedo to Mexico to kill him shortly after Garcia's death, and that Murillo in turn requested Perez's help. It required no great leap in logic for a juror to infer that Murillo informed Perez of the plan's details upon enlisting his help. Other evidence in the record also supports this conclusion. Perez took precautions that could be interpreted as demonstrating his knowledge that the plan was always to murder Macedo: Perez made the group stop on the way to Mexico so he could retrieve an identification card that would allow him to reenter the

---

[11] Perez does not challenge the substantive elements of the murder or kidnapping charges, just his participation in the conspiracy to commit those crimes.

United States, but refused to allow Macedo to get his own identification card; and Perez told Aquino not to use real names or monikers on the trip, indicating that Perez knew the purpose of the trip was not benign. Finally, the counter-narrative Perez presents is far less plausible. As Perez tells it, without more than a few hours' advance notice, he agreed to go along with Murillo, Aquino, and Macedo on a multi-day, nonlethal trip to Mexico without clear purpose; acquiesced somewhere along the way in a plan to murder Macedo; threw a rope around the young man's neck; and yelled, "Die, motherfucker, die!" before casting Macedo's body off a cliff. The evidence does not compel that unlikely conclusion—a reasonable jury could conclude otherwise from the evidence presented. *See Jackson*, 443 U.S. at 318. Perez's conspiracy convictions are affirmed.

## III

In addition to their merits-based arguments, Hernandez and Leonidas challenge their sentences as both procedurally erroneous and substantively unreasonable.**[12]** Beginning with their procedural challenges, we "review the district court's interpretation of the Guidelines de novo, the district court's application of the Guidelines to the facts of the case for abuse of discretion, and the district court's factual findings for clear error," if the claim was preserved. *United States v. Treadwell*, 593 F.3d 990, 999 (9th Cir. 2010), *overruled on other grounds by United States v. Miller*, 953 F.3d 1095, 1103 n.10 (9th Cir. 2020). Where the claim was not preserved, the district court's determination is reviewed for

---

**[12]** Because Perez's conviction is reversed as to Count Eighteen, we decline to reach his sentencing challenges at this time. *See United States v. Cortes*, 757 F.3d 850, 866 (9th Cir. 2014) (sentencing appeal moot where the court was already vacating conviction).

plain error.[13] *See, e.g.*, *United States v. Valencia-Barragan*, 608 F.3d 1103, 1108 (9th Cir. 2010). A sentence is substantively reasonable if it is "sufficient, but not greater than necessary" under the totality of the circumstances and § 3553(a) factors. *United States v. Carty*, 520 F.3d 984, 994–95 (9th Cir. 2008) (en banc). We do not adopt a presumption of reasonableness purely because a sentence is within Guidelines, but "when the judge's discretionary decision accords with the [Sentencing] Commission's view of the appropriate application of § 3553(a) in the mine run of cases, it is probable that the sentence is reasonable." *Id.* at 994 (quoting *Rita v. United States*, 551 U.S. 338, 351 (2007)). We affirm the district court's sentencing determinations as to both Appellants because the court correctly computed the applicable Sentencing Guidelines and committed no reversible error.

## A

Hernandez and Leonidas jointly object to the district court's drug weight calculation under U.S.S.G. § 2D1.1; application of threat and firearm enhancements under the same subsection; explication of § 3553(a) factors; and use of judicial fact-finding, which Appellants style as a violation of the Fifth and Sixth Amendments. Hernandez individually objects to the court's application of obstruction of justice and managerial-role enhancements under U.S.S.G. § 2D1.1. Leonidas individually objects on a Rule 32 basis, claiming that the court below did not address his minor-role adjustment argument. We hold that the district court's only error was in its application of the firearm enhancement to

---

[13] Instances where the claim was not preserved are noted in our discussion below. The reader should otherwise assume that it was preserved.

Hernandez, but that this error was harmless and therefore does not warrant reversal.

1

Appellants attack the district court's drug quantity calculation on almost every front, but each blow misses the mark. The district court properly utilized the multiplier method to calculate the amount of drugs Appellants were responsible for under U.S.S.G. § 2D1.1 in order to set a base offense level. *See Treadwell*, 593 F.3d at 999–1000 (method of approximation must be reviewed de novo); *United States v. Culps*, 300 F.3d 1069, 1076–77 (9th Cir. 2002) (multiplier method is appropriate where the "amount of drugs seized does not reflect the scale of the offense"). "Under the multiplier method, the district court accounts for the defendant's behavior over time by determining a daily or weekly quantity, selecting a time period over which it is more likely than not that the defendant was dealing in that quantity and multiplying these two factors together." *Id.* at 1077.

The district court's multiplier-method calculation centered on the evidence adduced at trial, including testimony about the amount of money collected weekly from the Third and Westlake drug hub and the highest average wholesale price of crack cocaine sold during the conspiracy. That figure was multiplied to account for the amount of drugs sold between 2000 and 2003, when both Hernandez and Leonidas were working at the Westlake location on behalf of CLCS, according to testimony found credible by the court. *See* U.S.S.G. § 1B1.3, cmt. n.2 (defendant is responsible "for all quantities of contraband with which he was directly involved and ... all reasonably foreseeable quantities of contraband that were within the scope" of the conspiracy). The district court's final calculation yielded

more than double the 25.2 kg threshold of crack cocaine needed to support the base offense level of 38 that the court selected as a result of its computation.

Appellants argue that the district court should have applied the clear and convincing standard of proof in making drug quantity determinations for sentencing. But we have "repeatedly held that sentencing determinations relating to the extent of a criminal conspiracy need not be established by clear and convincing evidence." *Treadwell*, 593 F.3d at 1001. Further, we have specifically stated that "factual disputes regarding drug quantity" should be resolved via the preponderance of the evidence standard. *United States v. Flores*, 725 F.3d 1028, 1035 (9th Cir. 2013). Appellants' challenges to the district court's drug quantity calculations are all factual and/or related to the extent of the conspiracy and their involvement therein. While it is not entirely clear from the record what standard the district court applied to its findings, to the extent that it used the preponderance of the evidence standard in its drug quantity determination, there was no error.

Somewhat more convincing is Appellants' argument that the dollar figures utilized by the district court were flawed. They argue that the court should have used a higher price for crack cocaine—$36,000 per kilogram retail, rather than the $20,000 per kilogram wholesale price that it chose—and should not have relied on the testimony of a co-conspirator witness who provided the $8,000 per week sales figure. But, in actuality, more than one witness testified to a similar sales figure at trial where they were subject to cross-examination, and the district court was entitled to rely on that information. *See United States v. Alvarez*, 358 F.3d 1194, 1213 (9th Cir. 2004) (three coconspirators' drug weight estimates were sufficiently reliable where they testified under oath and were

subject to cross-examination). Moreover, even if the district court had utilized the $36,000 per kilogram figure that Appellants prefer, the final quantity calculation would still result in more than 25.2 kg of crack cocaine over three years, again placing Appellants at a base offense level of 38. The district court may have had good reason for choosing the wholesale price rather than the retail price for its calculation, given that testimony at trial supported the notion that Hernandez and Leonidas acted as "wholesaler[s] to the little homies," and any arguable error was harmless. *See, e.g.*, *id.* (error in drug calculation is harmless if adjustment to correct error does not lead to a lesser base offense level).

Finally, the record supports the district court's determination that both Appellants were continuously working at the Westlake drug hub during the selected time period of 2000 to 2003, with Hernandez running the show and Leonidas and his twin brother acting as muscle. The district court cited Appellants' "long standing participation in the scheme," and found that the drug sales at Westlake were "reasonably foreseeable in connection with the scope of the defendant[s'] agreement as to the jointly undertaken scheme." *See United States v. Ortiz*, 362 F.3d 1274, 1275 (9th Cir. 2004) (conduct of a member of a conspiracy must be "*both* in furtherance of jointly undertaken activity *and* reasonably foreseeable" for it to be considered at sentencing). Drug sales, and the money flowing from them, were evidently consistent during the timeframe selected. *See Culps*, 300 F.3d at 1081 (drug operation must be continuous during period of time selected). Because we can find no evidence, and Appellants present none, to dispute the time period selected by the district court, evidence of the continuous nature of the drug sales from the Westlake location during that time, and Appellants' extensive connection to those drug sales, the district court did not err

in its calculation of a base offense level of 38 for Hernandez and Leonidas.

2

The district court applied two enhancements to the base offense level calculation of both Leonidas and Hernandez: a two-level enhancement for firearm possession and a two-level enhancement for the use or direction of violence or credible threats of violence. U.S.S.G. § 2D1.1(b)(1)–(2). Both may be applied on the same facts. *Id.* § 2D1.1 cmt. n.11(B).

A two-level firearm enhancement is proper if a defendant possesses a weapon in furtherance of the drug trafficking offense. *Id.* § 2D1.1(b)(1). In conspiracy cases, we look to "all of the offense conduct, not just the crime of conviction," when determining if a defendant possessed a firearm in furtherance of a scheme. *United States v. Willard*, 919 F.2d 606, 610 (9th Cir. 1990) (citing U.S.S.G. § 1B1.3(a)(2)). Possession can include constructive possession, which applies when there is "a sufficient connection between the defendant and the contraband to support the inference that the defendant exercised dominion and control over [it]." *United States v. Boykin*, 785 F.3d 1352, 1364 (9th Cir. 2015) (internal quotation marks omitted). *See also* U.S.S.G. § 2D1.1 cmt. n.11(A) (enhancement may be applied if weapon "was present, unless it is clearly improbable that the weapon was connected with the offense").

No firearms were recovered in this case, however, and none of the evidence cited by the district court indicates that Hernandez possessed a firearm that may have been connected to any offense. *See United States v. Briggs*, 623 F.3d 724, 731 (9th Cir. 2010) (reversal of sentence for application of firearm enhancement where "defendant

repeatedly bragged about the guns he had access to, but none of these firearms was ever recovered"); *United States v. Miller*, 890 F.3d 317, 328 (D.C. Cir. 2018) ("The District Court plainly erred by imposing the enhancement because it made no factual finding as to any nexus between those firearms and Appellant's drug convictions . . . ."). The district court made no finding about which Appellant possessed or controlled the firearm that was used in the Barajas murder. Neither did the court explain whether Hernandez may have had constructive possession over a firearm that was found on a fugitive arrested by LAPD officers at Hernandez's apartment, or whether a firearm that Hernandez apparently gave to Pantoja in 2000 for Pantoja's personal protection could in any way link back to Hernandez's possession during the course of the scheme— we think both situations are improbable. *See United States v. Kelso*, 942 F.2d 680, 682 (9th Cir. 1991) (reversal warranted where enhancement was applied to defendant who "may have had access to the gun, [but] there is no evidence he owned it, or even was aware of its presence").

Likewise, we cannot place any specific firearm in Hernandez's possession based solely on his general involvement in "green-lighting" and "gangbanging." *Cf. United States v. Heldberg*, 907 F.2d 91, 94 (9th Cir. 1990) (recovered gun was possessed during time period of importation of drugs). Although the district court's concern about the CLCS tradition of violence is well supported on this record, without any actual evidence of a firearm that Hernandez may have exercised "dominion or control over," we cannot condone application of the enhancement. *Compare Briggs*, 623 F.3d at 731, *with Boykin*, 785 F.3d at 1364 (enhancement proper where agents recovered firearms at defendant's residence where he also conducted drug sales); *Willard*, 919 F.2d at 609–10 (enhancement

proper where guns were recovered at defendant's place of business).

The same is not true for Leonidas, however, because the district court relied on testimony about his actual handling of a firearm. Direct testimony established that Leonidas and his brother, Vladimir, terrorized someone with a "12-gauge shotgun," and that Leonidas was seen by another witness with two guns during the course of the conspiracy. There was also evidence in the record that, in 2002, a police officer observed Leonidas removing a stainless-steel handgun from his waistband and placing it on the tire of a van shortly before fleeing. The handgun was later recovered and Leonidas was arrested. From these facts, the district court could have reasonably concluded that, during the conspiracy, Leonidas had constructive possession of a firearm, which may have been used in furtherance of the aims of the CLCS enterprise.

There was no error in applying the enhancement to Leonidas and, although the district court erred in applying the firearm enhancement to Hernandez, such error does not require reversal. "When a defendant is sentenced under an incorrect Guidelines range—whether or not the defendant's ultimate sentence falls within the correct range—the error itself can, and most often will, be sufficient to show a reasonable probability of a different outcome absent the error." *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1345 (2016). But here, even without the two-level firearm enhancement, the Guidelines range is the same. The correct Guidelines calculation still yields a sentence recommendation of life for Hernandez at offense level 43. *See* U.S.S.G. Sentencing Table. The district court also made quite clear that a sentence of life imprisonment was warranted from the evidence introduced at trial. Any effect

on Hernandez's sentence was therefore harmless. *See United States v. Munoz-Camarena*, 631 F.3d 1028, 1030 n.5 (9th Cir. 2011) (per curiam).

Turning to the district court's two-level enhancement for use or direction of threats, we find no error in its application to either Hernandez or Leonidas. While it may be based on the same underlying circumstances as the firearm enhancement, under U.S.S.G. § 2D1.1(b)(2), a separate two-level enhancement can be imposed if "the defendant used violence, made a credible threat to use violence, or directed the use of violence." Multiple witnesses testified that Hernandez was in charge of gangbanging for CLCS, and further evidence established that he took young members to the neighboring Rockwood community to "put in work," during which time they killed a Rockwood gang member. The district court also cited evidence of a threat by Hernandez to throw someone off the roof of a building. At Leonidas's sentencing hearing, the district court again cited his use of a 12-gauge shotgun to terrorize a witness, and also credited testimony that Leonidas went along for a shooting mission against the Burlington Locos gang and slashed a gang member's tires "as part of a . . . get-out-of-town threat." At a minimum, this evidence establishes, by a preponderance of the evidence, that both Appellants credibly threatened violence and that Hernandez also directed the use of violence. The district court did not err in applying the U.S.S.G. § 2D1.1(b)(2) threat enhancement to either Hernandez or Leonidas.

3

Hernandez individually challenges the district court's application of an obstruction of justice enhancement under U.S.S.G. § 3C1.1 and an aggravated-role enhancement

under U.S.S.G. § 3B1.1(b) to his overall Guideline calculation.  We conclude that both were properly applied.

An obstruction enhancement is proper:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

U.S.S.G. § 3C1.1.    Application Note 4(A) provides examples of obstruction, which include "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so."  A defendant may be held responsible for the actions of others if he "willfully caused" or "aided and abetted" those acts.  *Id.* § 3C1.1, cmt. n.9.  We have often affirmed sentencing enhancements under § 3C1.1 where the defendant intimidated, or shared information about, an individual working as a police cooperator or "snitch."  *See, e.g.*, *United States v. Scheele*, 231 F.3d 492, 500 (9th Cir. 2000) (defendant used threatening language and called police cooperator a "narc"); *United States v. Jackson*, 974 F.2d 104, 106 (9th Cir. 1992) (defendant passed around co-defendant's cooperation agreement with the words "rat" and "snitch" written at the top).  "Where a defendant's statements can be reasonably construed as a threat, even if they are not made directly to the threatened person, the defendant has obstructed justice."  *Id.*

At trial, a co-conspirator, Villalobos, testified that Hernandez visited his home and told Villalobos's wife that he should not cooperate with law enforcement. Villalobos also testified that Hernandez effectively called him out as a cooperator at a downtown Los Angeles lockup. Hernandez argues that these co-conspirator statements are not reliable and are hearsay.

As noted earlier, the district court is entitled to rely on co-conspirator testimony offered at trial. *Alvarez*, 358 F.3d at 1213. And while a district court may consider "relevant information without regard to its admissibility under the rules of evidence applicable at trial," U.S.S.G. § 6A1.3(a), Hernandez is correct that "[c]hallenged information is deemed false or unreliable if it lacks some minimal indicium of reliability beyond mere allegation," *United States v. McGowan*, 668 F.3d 601, 606–07 (9th Cir. 2012) (internal quotations omitted). Hernandez is also correct that the testimony of Villalobos's wife may well constitute hearsay-within-hearsay,[14] but the lockup incident at the Metropolitan Detention Center holding federal prisoners that Villalobos himself witnessed firsthand provides a second basis for the district court's holding. Because we conclude that the testimony about the lockup incident is not unreliable to the degree of any of the cases cited by Hernandez, the district court properly relied on it in applying the enhancement. *Cf. id.* at 607–08 (the only evidence was transcript-based testimony without opportunity for cross-examination or observation for credibility); *United States v. Hanna*, 49 F.3d

---

[14] Appellants' counsel did not object on hearsay grounds when the testimony was offered at trial, but it is unclear from the record whether Villalobos's wife is a co-conspirator whose statement would be admissible over such an objection, as well as being an admission against penal interest of the declarant.

572, 577–78 (9th Cir. 1995) (the only evidence was contradicted testimony, given at the sentencing hearing, of a single event by co-defendant who had already pleaded guilty and repeatedly invoked Fifth Amendment).

Similarly, there was no clear error in the district court's application of an aggravated-role enhancement to Hernandez's sentencing calculation. *See United States v. Yi*, 704 F.3d 800, 807 (9th Cir. 2013). A three-level enhancement, as was utilized, is available for a defendant who acts as "a manager or supervisor (but not an organizer or leader) [where] the criminal activity involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b). A court should consider "all persons involved during the course of the entire offense" when deciding if an organization is "extensive." *Id.* § 3B1.1(b) cmt. n.3. The introductory commentary for U.S.S.G. § 3B also notes that the "determination of a defendant's role in the offense is to be made on the basis of all conduct," including "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." *See United States v. Tankersley*, 537 F.3d 1100, 1110 (9th Cir. 2008) (noting that such considerations are "particularly appropriate when sentencing members of a pervasive and farranging [sic] criminal enterprise"); *Ortiz*, 362 F.3d at 1275.

During Hernandez's sentencing hearing, the district court cited the testimony of four different co-conspirators to support its conclusion that Hernandez was "a manager or a supervisor" of the drug conspiracy. This included evidence that Hernandez was in charge of the Westlake drug distribution hub from 2000 to 2003, in charge of gangbanging for an even longer period, and was part of the "core group" and "top echelon legal team" of CLCS.

Hernandez disputes this characterization of his involvement and claims he was in fact a notorious partier who was absent from many major gang decisions.

When viewing the conspiracy as a whole, it was clearly both "extensive" *and* involved at least five other participants, only one of which is necessary. *See* U.S.S.G. § 3B1.1(b). The district court was also correct in concluding that Hernandez was a "manager or supervisor" because he oversaw and exercised some control over one or more of the other participants. *See Gadson*, 763 F.3d at 1222. Evidence established that Hernandez played a large role in the operation of the Westlake drug hub and was regarded as the head of gangbanging. He directly oversaw the actions of the two Iraheta brothers and exercised authority over many other members of the gang, including traqueteros. *See United States v. Franco*, 136 F.3d 622, 631 (9th Cir. 1998) ("manager or supervisor" enhancement supported by proof of one other participant running an errand for defendant who "set up the final transaction but did not handle the drugs himself" and the inference that others also acted at his direction). Though Hernandez may not have been present for every major sea change in gang leadership and strategy, he meets the criteria necessary for the enhancement and we reject his request to conclude otherwise.

4

Leonidas individually challenges his sentence on the basis that the district court failed to resolve one of his objections to the PSR, under Federal Rule of Criminal Procedure 32(i)(3)(B) ("Rule 32"). Rule 32 requires that the court, at sentencing, "must—for any disputed portion of the presentence report or other controverted matter—rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the

court will not consider the matter in sentencing."  But only "factual objections" to the presentence report are considered "disputed" for purposes of Rule 32.  *See United States v. Petri*, 731 F.3d 833, 840 (9th Cir. 2013).  Sentencing adjustments "ordinarily do[] not require specific fact-finding," unless a defendant contests "specific factual statements made in the PSR."  *United States v. Carter*, 219 F.3d 863, 866 (9th Cir. 2000).  This issue was not raised in the court below and is therefore reviewed for plain error.  *United States v. Christensen*, 732 F.3d 1094, 1101 (9th Cir. 2013).

We reject Leonidas's Rule 32 argument because he failed to contest any factual statements made in the PSR.  Though the sentencing memorandum filed by his counsel included the assertion that Leonidas should receive a two-level reduction for his minor role in the enterprise, it did not contradict any of the facts in the PSR.  Leonidas's memorandum simply marshaled additional facts from trial in support of his argument that the district court should apply the reduction.  This kind of challenge does not trigger Rule 32, and the court was not otherwise obligated to make specific findings of fact to justify its decision not to apply the reduction.  *See Petri*, 731 F.3d at 841 (rejecting request for minor-role reduction where objection was raised but defendant "did not allege a factual inaccuracy in the presentence report"); *Christensen*, 732 F.3d at 1102 ("Because [the defendant] never made specific factual objections to the PSR regarding victim impact and loss amounts, Rule 32 was never triggered.").  No Rule 32 violation was committed.

5

Hernandez and Leonidas jointly argue that the district court's explanation of how its sentencing determinations

square with § 3553(a) was lacking because the court did not address each of their objections to judicial findings or provide "reasons specific to each appellant." "[A] sentencing judge does not abuse his discretion when he listens to the defendant's arguments and then 'simply [finds the] circumstances insufficient to warrant a sentence lower than the Guidelines range.'" *United States v. Amezcua-Vasquez*, 567 F.3d 1050, 1053–54 (9th Cir. 2009) (second alteration in original) (quoting *Carty*, 520 F.3d at 995). Because the Appellants did not object to the district court's § 3553(a) findings below, we review the determination under the even more deferential plain-error standard. *See Valencia-Barragan*, 608 F.3d at 1108.

After calculating the base offense level, listening to arguments—first about the Guidelines calculation, then about the § 3553(a) factors—from both sides, and directly citing to multiple aspects of the record supporting his § 3553(a) determinations, the district judge gave a within-Guidelines sentence to both Appellants. The court recited some of the same concerns at both Hernandez's and Leonidas's sentencing hearings but provided individualized facts that supported its determination as to each. We find no error in proceeding in this manner, let alone one that was plain.

6

Hernandez and Leonidas argue that the Sixth Amendment and the Fifth Amendment's Due Process Clause prohibited the district court from relying only on judicial findings of fact to justify giving them both life sentences. Appellants specifically point to the fact that if the court had adopted the drug amounts found by the jury, they should have been given 150-month sentences, at most. Because

these arguments were first raised on appeal, we review for plain error. *See Treadwell*, 593 F.3d at 1016.

Appellants' joint brief ignores the fact that the jury found them responsible for possession of 280 grams or more of a mixture that contains cocaine base under 21 U.S.C. § 841(b)(1)(A)(iii), which allows for a maximum penalty of life imprisonment. This Court has repeatedly stated that the Fifth and Sixth Amendments do not limit a judge's discretion to find facts at sentencing, as long as the resulting sentence does not exceed the statutory maximum based on the facts found by the jury. *See Treadwell*, 593 F.3d at 1017; *United States v. Raygosa-Esparza*, 566 F.3d 852, 855 (9th Cir. 2009) (rejecting Fifth and Sixth Amendment challenges because "[t]he revised sentence imposed by the district court for each offense does not exceed th[e] statutory maximum. Accordingly, no constitutional violation occurred, even if the district court did rely on facts not found by the jury.").

Appellants cite *Apprendi v. New Jersey*, 530 U.S. 466 (2000), but neither that case nor its progeny guard against sentences within the prescribed statutory maximum based on facts found by the jury. *Id.* at 490 (jury must decide facts increasing statutory maximum penalty); *United States v. Booker*, 543 U.S. 220, 233 (2005) (increasing judicial discretion in sentencing by making the Sentencing Guidelines advisory to avoid Sixth Amendment problems); *United States v. Fitch*, 659 F.3d 788, 795–96 (9th Cir. 2011) (citing these standards as supporting the conclusion that the "sentencing judge has the power to sentence a defendant based upon facts not found by a jury up to the statutory maximum"). As such, Appellants' constitutional argument is without merit.

B

The substantive-unreasonableness claims raised by Hernandez and Leonidas also fail. Though Appellants are correct that the district court considered the Barajas murder during sentencing, finding both Appellants responsible under the preponderance of the evidence standard, the court explicitly declined to consider that crime in its offense level calculation. Instead, the court determined Appellants' offense level using evidence of their drug trafficking activities and reserved the Barajas murder for consideration among other § 3553(a) aggravating factors. For Hernandez, this included: his leadership role, his substantial engagement in drug-dealing and gangbanging, his promotion of violence, and his use of intimidation tactics. For Leonidas, the court cited: his participation in shooting missions, general gangbanging in rival territory, violent threats, and his allegiance to the gang all the way up through trial. Community protection was another important consideration cited by the trial judge at both sentencing hearings. Appellants' sentences were within the Guidelines range calculated by the court (life for Hernandez and 360 months to life for Leonidas), and the § 3553(a) testimony cited justifies a sentence on the higher end of the range for Leonidas. *See Carty*, 520 F.3d at 993–94. The life sentences imposed for Hernandez and Leonidas were not substantively unreasonable.

IV

Hernandez's, Leonidas's, and Vladimir's convictions are affirmed. Perez's convictions on Counts One, Sixteen, Seventeen, and Twenty are affirmed, but his conviction on Count Eighteen is vacated and remanded. The government may choose to retry Perez on that count or the district court may resentence him without it if no retrial is conducted.

Though the district court improperly applied the firearm enhancement to Hernandez, the error was harmless, and all of Hernandez's and Leonidas's other sentencing-related challenges fail. We hold that there was no error in the district court's decision to give both Hernandez and Leonidas life sentences. Because the district court accounted for Perez's Count Eighteen conviction in sentencing him, we remand for resentencing if the government elects not to retry him on that charge.

**AFFIRMED** in part, **REVERSED** and **VACATED** in part, and **REMANDED** with instructions.